FILED
DISTRICT COURT
DIVISION

04 SEP -7  PM 4: 08

DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF INDIANA

### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ALASKA ELECTRICAL PENSION FUND, Derivatively on Behalf of ITT EDUCATIONAL SERVICES, INC., | : : : : | No. |
| | : | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES** |
| Plaintiff, | : : | |
| vs. | : : : | |
| RENE R. CHAMPAGNE, JAMES D. FOWLER, JR., JOHN E. DEAN, VIN WEBER, RAND V. ARASKOG, JOANNA T. LAU, JOHN F. COZZI, DANIEL P. WEADOCK, HARRIS N. MILLER, OMER E. WADDLES, THOMAS W. LAUER, MARTIN A. GROSSMAN, KEVIN M. MODANY and PRICEWATERHOUSECOOPERS LLP, | : : : : : : : : : : | 1 : 04-cv- 1 456 -JDT -WTL |
| Defendants, | : : | |
| – and – | : : : | |
| ITT EDUCATIONAL SERVICES, INC., a Delaware Corporation, | : : : | |
| Nominal Defendant. | : : | |

This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following: unique and original selection, coordination, expression, arrangement, and classification of the information.

No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports or news articles quoted within this work.

Copyright© 2004 by William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP. William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this writing/publication.

All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP is prohibited.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of ITT Educational, Inc. ("ITT" or the "Company") on behalf of ITT against certain of its current and former officers and directors and against its public accounting firm, PricewaterhouseCoopers LLP ("PWC"): (a) derivatively on behalf of ITT for violations of §10(b) of the Securities and Exchange Act of 1934 (the "1934 Act") and Rule 10b-5; (b) for breaches of fiduciary duties of loyalty and care and for aiding and abetting those breaches; (c) for abuse of control; (d) for gross mismanagement; (e) for constructive fraud; (f) for unjust enrichment; and (g) for professional negligence and malpractice against PWC. The Complaint's allegations arise out of defendants causing ITT to violate state and federal educational finance laws and regulations by falsifying its student records and causing ITT to violate the federal securities laws by falsifying its accounting, auditing and financial reporting between October 2002 and April 2004 (the "Relevant Period").

2.      ITT is a leading for-profit provider of technology-oriented postsecondary degree programs in the United States. The Company's business is heavily dependent upon its students being able to obtain public education funding as 95% of its revenues are derived from student-paid tuition and over 70% of that tuition is provided by federal or state grants and loans to ITT's students and their families. Because of its need to remain certified with accrediting agencies to facilitate such funding, the Company's business is highly regulated by federal and state accrediting agencies and maintenance of the Company's business and reputation is heavily dependent upon staying in compliance with federal and state educational finance laws and regulations.

3.      ITT is a valuable and potentially very profitable franchise. On October 21, 2002, the beginning of the Relevant Period, the Company issued a press release disclosing that ITT had been included for the third consecutive year in Forbes Magazine's list of "200 Best Small Companies." The Company received Forbes' overall ranking of 36, up from 82 in 2001 and 122 in 2000. For

2002, ITT was ranked 11th in five-year average return on equity, 38th in sales, 44th in market value and 63rd in profits.

4.        Despite risk of severe damage to the Company's stellar reputation in the for-profit higher education field, throughout the Relevant Period defendants caused ITT: (a) to systematically falsify records, such as those relating to enrollment, graduation and job placement rates, in order to artificially inflate its reported operational and financial performance; (b) derive a material portion of the Company's reported revenues through fraudulent business practices, such as federal grants and financial aid payments that were secured through falsified records; (c) inaccurately portray the results of the Company's operations, attributing a material portion of those results to prohibited practices; and (d) fail to prepare and report the Company's financial results in accordance with Generally Accepted Accounting Principles ("GAAP") and fail to fairly present its actual financial results or condition.  Defendants did this all while knowing that ITT's operations were being closely scrutinized by state and federal investigators based on allegations of misconduct which arose first in 1999.

5.        In 1999, a federal whistleblower action was brought by two former ITT admissions/recruiting employees alleging ITT was violating federal educational finance law, risking its certification to receive government-supported tuition payments, by illegally paying its recruiters percentages and bonuses based on student recruitment.  The practice is highly violative of educational finance laws because it induces the recruitment of unqualified students.  In response to the 1999 whistleblower action, in 2000 the U.S. Department of Justice (the "DOJ") served subpoenas and began an investigation into the Company's recruiting compensation, the U.S. Department of Education (the "DOE") commenced its own investigation and temporarily limited ITT's ability to qualify for federal educational funding and a multi-plaintiff civil lawsuit was commenced and settled

in California on behalf of over 50 ITT students for an undisclosed sum alleging misrepresentations by admissions personnel. The investment community severely punished ITT's stock price and the Company's common stock dropped 25% in a single trading day on the news of the DOE's action alone.

6.   Despite being named as a defendant in the 1999 whistleblower action, defendant PWC continued serving as ITT's "independent accountants" – and accepting lucrative compensation from ITT for doing so – to ensure that ITT would not hire a truly independent auditor which would conduct an unbiased audit and disclose PWC's and the Individual Defendants' past and ongoing misconduct. Instead, PWC accepted over $1.2 million in audit and non-audit fees from ITT for 2002 and 2003 and once again, on March 9, 2004, the Individual Defendants, including the members of ITT's Audit Committee, reapproved PWC as ITT's purported "independent auditors" despite their direct involvement in the fraud alleged herein.

7.   With the able assistance of PWC, by the fall of 2002, defendants had effectively mollified investors by promising that the Company's legal problems were behind it and that the allegations were unfounded. According to filings defendants caused ITT to make with the Securities and Exchange Commission (the "SEC"), most of the legal actions had been resolved, including the 1999 whistleblower action which had been dismissed in defendants' favor and was only pending appeal. However, unbeknownst to the financial markets – because ITT did not disclose it – in October 2002 the California Attorney General (the "CAG") commenced a formal investigation into the Company's compliance with California's educational finance laws based on, among other things, the same recruitment compensation issues that arose in the 1999 whistle-blower action. Additionally, beginning in approximately September 2003 the DOJ began obtaining records concerning compensation paid to ITT's recruiting/admissions employees from the federal agency

charged with accrediting for-profit schools and in October 2003, the DOJ subpoenaed these same materials from the Indiana Commission on Proprietary Education. One senior ITT Board member has since admitted that the Company's general counsel briefed the ITT Board on these legal issues on several occasions after the commencement of the CAG's investigation in October 2002. Nonetheless, everything known by the ITT Board, its executives and PWC about the commencement of the CAG and DOJ investigations was actively concealed from the investment community by defendants throughout the Relevant Period.

8.     Instead, defendants caused the Company to continue to report quarter after quarter of purportedly steady increases in new student enrollment, existing student enrollment, revenues and profits. Despite the fact that Company's officers and directors and PWC, its so-called "independent accountants," were all on notice of the 1999 whistleblower action by virtue of being named as defendants in that action, defendants continued to represent that the Company's publicly-reported financial results complied with applicable accounting rules and regulations when they did not. As a result of these false but positive results, the Company's stock price spiraled from approximately $15 per share in October 2002 to a Relevant Period high of over $60 per share by February 2004.

9.     Throughout the Relevant Period, defendants publicly touted the Company's business and financial performance, and the seemingly strong growth in its revenue, earnings and new enrollments. Such representations were included in the Company's press releases, SEC filings and conference calls. Such representations were materially false and misleading, and thus violative of the federal securities laws, because, unbeknownst to investors, the defendants failed to disclose that ITT had been regularly falsifying records used as indicators of its operational success such as placement figures and rates, retention figures and rates, graduation figures and rates and attendance figures and rates in order to allow it to present the appearance of strong operational and financial

- 5 -

performance. The strong growth reported by the Company throughout the Relevant Period was grounded in these fraudulent and inherently unsustainable reporting practices, rendering ITT's reported historical financial performance and projections of future growth materially false and misleading.

10.     Defendants were motivated to disseminate materially false and misleading statements about the Company so that ITT's incumbent Board and executives could maintain the power, prestige and financial perks ITT was providing and so that ITT insiders could sell their personal ITT stock at artificially inflated prices. During the Relevant Period, ITT insiders sold over 600,000 shares of the Company's common stock at artificially inflated prices, reaping gross proceeds of over $14 million. In order to further prop up the Company's stock price during the Relevant Period to facilitate these sales, the Individual Defendants caused ITT to repurchase over $22 million worth of its own common stock on the open market – despite knowledge by the Company's officers and directors that they were actively and knowingly concealing the news about the 2002 CAG investigation and the DOJ's investigation – and that if the market knew about this information the Company's stock price would decline as it had in 2000 following the disclosure of the DOE and DOJ investigations.

11.     Suddenly and without any warning, on February 25, 2004, before the opening of ordinary trading, defendants caused the Company to issue a press release announcing that the DOJ had raided its corporate headquarters and 10 of its schools and that its entire Board of Directors and several top executives and employees had been served with a search warrant and related grand jury subpoenas issued by the U.S. District Court for the Southern District of Texas – the same court where the 1999 whistleblower action had originally been filed. Defendants' press release on February 25, 2004 explained that the "search warrant and related grand jury subpoenas relate to

- 6 -

information and documentation regarding placement figures and rates, retention figures and rates, graduation figures and rates, attendance figures and rates, recruitment and admissions materials, student grades, graduate salaries and transferability of credits to other institutions."

12.    In reaction to this announcement, the price of ITT's common stock plummeted, falling from $57.40 per share on February 24, 2004 to close at $38.50 on February 25, 2004 – a massive one-day drop of 33% on unusually heavy trading volume.

13.    Then, March 9, 2004, defendants caused ITT to file its 2004 Annual Proxy Statement to Shareholders with the SEC. In the 2004 Proxy, the defendants disclosed that ITT was under investigation not only by the DOJ but also by the SEC, which initiated an inquiry on March 4, 2004 into the DOJ's allegations against ITT. Further, defendants finally disclosed in ITT's 2004 Proxy that the CAG had initiated an investigation of ITT in October 2002 for matters related to the DOJ investigation. ITT's stock fell further:



**ITT Educational Services, Inc.**
**Daily Share Pricing: August 2, 2002 to March 31, 2004**

14.     Upon the revelations of ITT's gross legal and accounting violations, the Company's stock fell precipitously by approximately 50%, ***erasing more than $1.4 billion in market capitalization by mid-March 2004***. Beyond the gravity-defying demise of the Company's once stellar reputation as an institution of higher education and the real threat to ITT's business model that its students will no longer qualify for state and federal grants and loans if it is deemed to have fallen out of compliance with applicable educational finance rules and regulations, the loss of market capitalization will make it much more difficult for ITT to obtain financing to meet its capital needs on favorable terms on a going-forward basis.

15.     On February 29, 2004, the first of a series of federal securities fraud class actions was filed in this District naming certain ITT officers and directors, including certain defendants named

herein, and the Company as defendants, exposing ITT to millions of dollars in potential liability due to defendants' misconduct. ITT's Chairman and Chief Executive Officer Rene B. Champagne is a defendant in the securities fraud actions and faces an imminent threat of personal liability as he was also named in the 1999 whistleblower action and had full knowledge of those allegations while he and others touted ITT's financial results and sold millions of dollars worth of ITT stock at inflated prices.

16.     Defendants disclosed in an April 2004 press release that PWC has refused to certify the accuracy of the Company's 1Q 2004 financial results and that the Company may need to restate previously reported financial results. On July 12, 2003, the Company's long-time President and Chief Operating Officer Omer E. Waddles resigned suddenly without explanation amidst the legal and accounting scandal. Like Champagne, Waddles too sold millions of dollars worth of stock at inflated prices and was named as a defendant in the securities fraud actions.

17.     The Company has also incurred tremendous legal fees conducting a so-called "internal investigation," which was really nothing but a white-wash designed to camouflage defendants' misconduct, and will incur more fees defending itself in the securities fraud actions and the CAG, DOJ and SEC investigations which are still ongoing. As of June 30, 2004, the Company reported it had already set aside over $15.3 million for legal fees arising out of defendants' misconduct.

18.     Defendants' misconduct has threatened to destroy this once valuable franchise. The members of the ITT Board of Directors participated in the misconduct that brought ruin to ITT, either by directly profiting by engaging in insider trading or by failing to prevent their peers from doing so. As alleged herein, several of the defendants either personally sold ITT common stock at inflated prices during the Relevant Period or permitted others to do so with full knowledge that:

- 9 -

(a) the Company and its auditors had been sued by former employees for falsifying records and that those actions and related state and federal investigations had not been concluded; (b) that the Company's false but positive results were based on the alleged falsification; and (c) that none of this misconduct had been disclosed to the market. Rather than directly participating in this misconduct or simply looking the other way, each ITT director was required to assure the Company's compliance with all state and federal educational funding laws and regulations and to ensure the accuracy of the Company's audited financial statements and oversee the Company's accounting practices to insure compliance with applicable law. By failing to fulfill important fiduciary duties, defendants actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached their fiduciary duties to the shareholders of ITT by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions, and PWC aided and abetted these breaches.

19.     Any pre-filing demand by plaintiff upon the ITT Board of Directors to pursue the claims alleged herein would be futile as the ITT Board is dominated and controlled by the wrongdoers, including Champagne and other executives who sold stock at inflated prices during the Relevant Period. At least three other directors are former executives of ITT Industrial, ITT's former parent corporation, and served on ITT's Board with Champagne and ITT since the Company's 1994 initial public stock offering. The livelihood of three of the remaining six directors who are not current or former executives of ITT is dependent upon maintaining a favorable relationship with Champagne. More importantly, the Board's gross misconduct clearly violated the Sarbanes-Oxley Act of 2002's call for transparency and corporate responsibility. In fact, the Board has demonstrated its hostility to the allegations contained herein by closing the purported "internal investigation" concerning the CAG investigation and announcing its determination that no misconduct occurred.

The Board members also caused their lawyers to move to dismiss a shareholder derivative action filed in Indiana State Court arguing that allegations substantially similar to those contained herein do not "demonstrate a substantial probability of personal liability." Because the ITT Board has unjustly and improvidently abrogated its fiduciary duties and is threatening to destroy this once valuable franchise, plaintiff brings this action derivatively on behalf ITT seeking to protect the Company's interests and to recover its losses.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over all claims asserted herein pursuant to: (a) 28 U.S.C. §1332, as complete diversity exists between plaintiff (a citizen of Alaska) and each defendant (none of whom are citizens of Alaska) and the amount in controversy exceeds the jurisdictional minimum of this Court; (b) 28 U.S.C. §1331, as plaintiff's claims arise in part out of the laws of the United States; (c) §27 of the 1934 Act, as to the derivative claims for violations of §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder; (d) 28 U.S.C. §1367 (supplemental jurisdiction); and (e) under principles of ancillary jurisdiction.

21.     Venue is proper in this District because ITT has its principal place of business in this District and many of the violations of applicable educational finance law occurred in and the false and misleading statements were made in or issued from this District. Plaintiff's cause of action arose in this District and ITT has suffered and will continue to suffer harm in this District. Moreover, each defendant has extensive contact with Indiana, including Individual Defendants Champagne, Modany and Lauer, who reside in this District.

## THE PARTIES

**Plaintiff**

22.     Plaintiff Alaska Electrical Pension Fund is, and was at times relevant hereto, an owner and holder of ITT common stock. Plaintiff is administered out of the State of Alaska and

none of plaintiff's trustees are citizens of the States of Indiana, Florida, Massachusetts, Virginia, New Jersey, Connecticut or New York.

**Nominal Party**

23. Nominal party ITT is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 13000 North Meridian Street, Carmel, Indiana. ITT is a provider of technology-oriented postsecondary degree programs in the United States. From 1966 until a 1994 initial public stock offering of 17% of ITT's stock, ITT was a wholly owned subsidiary of ITT Industries ("old ITT"), a diversified conglomerate. Old ITT maintained its 83% equity interest in ITT until old ITT was divided into three firms in 1995 by defendant Araskog, then old ITT's chief executive officer, resulting in the formation of: ITT Corp. (involved in entertainment, hotels and information services); ITT Hartford Insurance (insurance); and the current ITT Industries (involved in industrial and defense industries). After the split-up, ITT remained a majority-owned subsidiary of ITT Corp. On February 23, 1998, Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") acquired ITT Corp. Through public offerings of Starwood's ITT common stock in June 1998 and February 1999 and ITT's repurchase of 1.5 million shares of its common stock from Starwood in February 1999, Starwood's equity interest in ITT was eliminated.

**Director Defendants**

24. The defendants identified in ¶¶25-33 are referred to herein as the "Director Defendants" and comprise the entire ITT Board of Directors as of the filing of this Complaint. Collectively, the Director Defendants, the Insider Selling Defendants (identified below at ¶¶25-26, 29, 35-37, and defendant Modavy (identified below in ¶38) are referred to herein as the "Individual Defendants." Because of each Individual Defendants' positions with ITT, he or she knew the adverse non-public information about the business of ITT, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and

- 12 -

connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to them in connection therewith. During the Relevant Period, each Individual Defendant participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings in breach of his or her fiduciary duties to ITT.

25.     Defendant Rene R. Champagne ("Champagne") is, and at all times relevant hereto was, Chairman, Chief Executive Officer and a director of ITT. Champagne is a citizen of Indiana. Champagne signed and certified (pursuant to §302 of the Sarbanes-Oxley Act) the Company's false and misleading Forms 10-K filed with the SEC for FY 2002 and 2003 and all interim quarterly reports on Form 10-Q from October 2002 through April 2004. For FY 2002, ITT paid defendant Champagne $1,107,175 in salary, bonus and other compensation, and granted him 110,000 options to purchase ITT stock. For FY 2003, ITT paid defendant Champagne $1,553,127 in salary, bonus and other compensation, and granted him 135,000 options to purchase ITT stock. During the Relevant Period, Champagne sold 135,000 shares of ITT stock at inflated prices while in possession of material, adverse non-public information, receiving over $5.37 million in illegal insider trading proceeds. Defendants concede in the Company's 2004 Annual Proxy Statement to Shareholders that Champagne is not independent and by virtue of his positions with the Company, his personal participation in the underlying misconduct, his own stock sales, his status as a defendant in the federal securities fraud actions, his having been subpoenaed in the federal grand jury investigation into ITT's educational finance fraud, and his long-term personal, professional and financial relationships with the other defendants, Champagne is not independent and could not have objectively considered a presuit demand to bring the allegations contained herein.

26.     Defendant Rand V. Araskog ("Araskog") is, and at all times relevant hereto was, a director of ITT. Araskog is a citizen of Florida. Araskog, a former director of the New York Stock Exchange, was chief executive officer of old ITT for almost two decades from 1980 to 1998 and still serves on the Hartford Financial Services Group, Inc. and ITT Industries boards of directors in addition to this Board membership. Araskog signed the Company's false and misleading Forms 10-K for fiscal 2002 and 2003 filed with the SEC. During the Relevant Period, Araskog sold 224,000 shares of ITT stock at inflated prices while in possession of material, adverse non-public information, receiving over $6.4 million in illegal insider trading proceeds. Araskog has admitted that the CAG investigation was discussed at several Board meetings before he sold his ITT stock. By virtue of his personal participation in the underlying misconduct, his own stock sales, his status as a former NYSE director, his having been subpoenaed in the federal grand jury investigation into ITT's educational finance fraud, and his long-term personal, professional and financial relationships with Champagne, Waddles and the other Individual Defendants, Araskog is not independent and could not have objectively considered a presuit demand to bring the allegations contained herein.

27.     Defendant Daniel P. Weadock ("Weadock") is, and at all times relevant hereto was, a director of ITT. Weadock is a citizen of Massachusetts. Weadock now serves as president of The International, a golf resort and conference center in Bolton, MA which was acquired by the ITT Corp. in 1961 and was exclusively used by the ITT Corp. and its executives and employees until it was sold in 1999. Weadock previously served under defendant Araskog, working for ITT Corp. for 38 years prior to assuming his position at The International in 1999, most recently serving as president and CEO of ITT Corp.'s Sheraton Hotels. Weadock signed the Company's false and misleading Forms 10-K filed with the SEC for FY 2002 and 2003. By virtue of his personal participation in the underlying misconduct, his having been subpoenaed in the federal grand jury

investigation into ITT's educational finance fraud, and his long-term personal, professional and financial relationships with Champagne, Waddles and the other Individual Defendants, Weadock is not independent and could not have objectively considered a presuit demand to bring the allegations contained herein.

28.     Defendant James D. Fowler, Jr. ("Fowler") is, and at all times relevant hereto was, a director of ITT.  Fowler is a citizen of Virginia.  Fowler served as a senior vice president and director, human resources of ITT Industries from November 2000 until his retirement in October 2002.  Fowler signed the Company's false and misleading Forms 10-K filed with the SEC for FY 2002 and 2003.  By virtue of his personal participation in the underlying misconduct, his having been subpoenaed in the federal grand jury investigation into ITT's educational finance fraud, and his extensive personal, professional and financial relationships with Champagne, Waddles and the other Individual Defendants, Fowler is not independent and could not have objectively considered a presuit demand to bring the allegations contained herein.

29.     Defendant Harris N. Miller ("Miller") is, and at all times relevant hereto was, a director of ITT.  Miller is a citizen of Virginia.  Miller has served as president of the Information Technology Association of America ("ITAA"), known as the tech school industry's trade group, since April 1995.  ITT provides ITAA with substantial financial support and ITT recruiters have used ITAA to solicit students, for instance, by steering potential students to the ITAA website which discusses industry salaries and using other ITAA materials to promote attendance at ITT.  During the Relevant Period, Miller sold 18,000 shares of ITT stock at inflated prices while in possession of material, adverse non-public information, receiving $931,268 in illegal insider trading proceeds. Miller also signed the false and misleading Forms 10-K filed for FY 2002 and 2003.  By virtue of his personal participation in the underlying misconduct, his own stock sales, his having been

- 15 -

subpoenaed in the federal grand jury investigation into ITT's educational finance fraud, the jeopardy to Miller's livelihood that a vigorous investigation of these allegations could occasion, and Miller's long-term personal, professional and financial relationships with Champagne, Waddles and the other Individual Defendants, Miller is not independent and could not have objectively considered a presuit demand to bring the allegations contained herein.

30.     Defendant John E. Dean ("Dean") is, and at all times relevant hereto was, a director of ITT. Dean is a citizen of Virginia. Dean is a founding and managing partner of the Dean Blakey law firm, where he specializes in federal legislation and regulation of student loan and assistance programs, and serves as a principal of Washington Partners, LLC, a public affairs firm. In these capacities Dean acts as a lobbyist and advisor for several for-profit educational institutions and lenders and his law firm specializes in advising on how to avoid and handle financial aid office audits. Dean signed the Company's false and misleading Forms 10-K filed with the SEC for FY 2002 and 2003. By virtue of his personal participation in the underlying misconduct, his heightened duty as a result of his knowledge and influence in the area of education finance, the negative impact involvement in this lawsuit could have on Dean's professional career, his having been subpoenaed in the federal grand jury investigation into ITT's educational finance fraud, and his long-term personal, professional and financial relationships with Champagne, Waddles and the other Individual Defendants, Dean is not independent and could not have objectively considered a presuit demand to bring the allegations contained herein.

31.     Defendant Vin Weber ("Weber") is, and at all times relevant hereto was, a director of ITT. Weber is a citizen of Virginia. Weber has been a partner at Clark & Weinstock Inc., a public policy consulting firm, since 1994, and the firm lists educational lender Sallie Mae as one of its most important representative clients. Clark & Weinstock's largest client by far is Microsoft, whose

- 16 -

programs are taught at ITT and which is one of the biggest employers of ITT graduates. Weber signed the Company's false and misleading Forms 10-K filed with the SEC for FY 2002 and 2003. By virtue of his personal participation in the underlying misconduct, the negative impact participating in this lawsuit could have on Weber's professional career, his having been subpoenaed in the federal grand jury investigation into ITT's educational finance fraud, and his long-term personal, professional and financial relationships with Champagne, Waddles and the other Individual Defendants, Weber is not independent and could not have objectively considered a presuit demand to bring the allegations contained herein.

32. Defendant John F. Cozzi ("Cozzi") is a director of ITT. Cozzi is a citizen of New Jersey. Cozzi previously served as served as a managing director in the investment banking division of Credit Suisse First Boston Corporation, an investment banking and financial services firm, and in that capacity personally served as the lead CSFB underwriter in Starwood's sale of its interest in ITT in 1999 to the public. Cozzi signed the Company's false and misleading Form 10-K filed with the SEC for FY 2003. By virtue of his personal participation in the underlying misconduct, his having been subpoenaed in the federal grand jury investigation into ITT's educational finance fraud, and his long-term personal, professional and financial relationships with Champagne, Waddles and the other Individual Defendants, Cozzi is not independent and could not have objectively considered a presuit demand to bring the allegations contained herein.

33. Defendant Joanna T. Lau ("Lau") is a director of ITT. Lau is a citizen of Massachusetts. Lau signed the Company's false and misleading Form 10-K filed with the SEC for fiscal 2003. By virtue of her personal participation in the underlying misconduct, her having been subpoenaed in the federal grand jury investigation into ITT's educational finance fraud, and her long-term personal, professional and financial relationships with Champagne, Waddles and the other

- 17 -

Individual Defendants, Lau is not independent and could not have objectively considered a presuit demand to bring the allegations contained herein.

**Insider Selling Defendants**

34.     The defendants identified below in ¶¶35-37 and defendants Champagne, Araskog and Miller, identified above in ¶¶25, 26 and 29, are referred to herein as the "Insider Selling Defendants." Because of each of each of the Insider Selling Defendants' positions with ITT, he or she knew the adverse non-public information about the business of ITT, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to them in connection therewith. During the Relevant Period, each Selling Defendant sold ITT stock at inflated prices without disclosing that defendants had caused ITT to: (a) falsify records relating to student attendance, grades, academic progress and graduate job placement statistics; (b) make fraudulent misrepresentations regarding the transferability of credits; (c) falsify student grade point average calculations used to qualify students for financial aid under the state grant programs; (d) retaliate against employees who complained about the misconduct; and (e) be subjected to an investigation for violating educational finance laws by the CAG in October 2002 and the DOJ thereafter.

35.     Defendant Omer E. Waddles ("Waddles") was, at all times relevant hereto, President, Chief Operating Officer and a director of ITT until his termination on July 12, 2004. Waddles is a citizen of Indiana. Waddles signed and certified (pursuant to §302 of the Sarbanes-Oxley Act) the Company's false and misleading Forms 10-K filed with the SEC for FY 2002 and 2003 and for all interim quarters from October 2002 through April 2004. For FY 2002, ITT paid defendant Waddles $629,776 in salary, bonus and other compensation, and granted him 50,000 options to purchase ITT

- 18 -

stock. For FY 2003, ITT paid defendant Waddles $792,257 in salary, bonus and other compensation, and granted him 60,000 options to purchase ITT stock. During the Relevant Period, Waddles sold 100,000 shares of ITT stock at inflated prices while in possession of material, adverse non-public information, receiving over $3.9 million in illegal insider trading proceeds. Defendant Waddles is named as a defendant in the federal securities fraud actions and received a federal grand jury subpoena.

36. Defendant Thomas W. Lauer ("Lauer") was, at all times relevant hereto, Senior Vice President, Director of Operations of ITT. Lauer is a citizen of Indiana. Lauer is named as a defendant in the federal securities fraud actions pending in this District and received a federal grand jury subpoena on February 24, 2004 that was issued, along with the search warrants, by the U.S. District Court for the Southern District of Texas. For FY 2002, ITT paid defendant Lauer $468,637 in salary, bonus and other compensation, and granted him 30,000 options to purchase ITT stock. For FY 2003, ITT paid defendant Lauer $544,876 in salary, bonus and other compensation, and granted him 30,000 options to purchase ITT stock. During the Relevant Period, Lauer sold 119,700 shares of ITT stock while in possession of material, non-public information, receiving over $4.88 million in illegal insider trading proceeds.

37. Defendant Martin A. Grossman ("Grossman") was, at all times relevant hereto, Senior Vice President and Director of Marketing and Investor Relations of ITT. Grossman is a citizen of Connecticut. Grossman is named as a defendant in the federal securities fraud actions pending in this District and received a federal grand jury subpoena on February 24, 2004 that was issued, along with the search warrants, by the U.S. District Court for the Southern District of Texas. During the Relevant Period, Grossman sold 10,000 shares of ITT stock while in possession of material, non-public information, receiving $484,253 in illegal insider trading proceeds.

**CFO and Accounting Defendants**

38.     Defendant Kevin M. Modany ("Modany") is, at all times relevant hereto was, Senior

Vice President and Chief Financial Officer of ITT. Modany is a citizen of Indiana. Modany signed

and certified (pursuant to §302 of the Sarbanes Oxley Act) the Company's false and misleading

Forms 10-K filed with the SEC for FY 2002 and 2003 and for all interim quarterly reports from

April 2003 through April 2004. Modany is named as a defendant in the federal securities fraud

actions pending in this District and received a federal grand jury subpoena on February 24, 2004 that

was issued, along with the search warrants, by the U.S. District Court for the Southern District of

Texas.     For FY 2002, ITT paid defendant Modany $267,510 in salary, bonus and other

compensation, and granted him 30,000 options to purchase ITT stock. For FY 2003, ITT paid

defendant Modany $465,256 in salary, bonus and other compensation, and granted him 20,000

options to purchase ITT stock.

39.     Defendant PricewaterhouseCoopers LLP ("PWC"), a citizen of New York, was

engaged by ITT to provide independent auditing and/or consulting services to ITT, including the

preparation, examination and/or review of ITT's annual and interim financial statements for FY

2002 and 2003, which financial statements were disseminated to investors. PWC was engaged to

and performed these services so that ITT's financial statements would be presented to, reviewed and

relied upon by securities purchasers, governmental agencies, the investing public and members of

the financial community. PWC was named as a defendant in the 1999 whistleblower action and was

actively defending itself in that case throughout the Relevant Period. As a result of the services it

rendered to ITT, PWC's representatives were frequently present at ITT's corporate headquarters and

financial offices between 2002 and 2003 and had continual access to ITT's confidential corporate

financial and business information, including information concerning ITT's compliance with

applicable educational finance laws and ITT's true financial condition and financial statements,

which information PWC was aware of and/or negligently disregarded. PWC actively participated in

the presentation, review and issuance of ITT's false financial statements. Defendant PWC issued an

unqualified audit reports on ITT's FY 2002 and 2003 financial statements, as set forth below:

## 2002 Report of Independent Accountants

To the Board of Directors and Shareholders
of ITT Educational Services, Inc.

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, cash flows and shareholders' equity present fairly, in all material respects, the consolidated financial position of ITT Educational Services, Inc. and its subsidiaries at December 31, 2002 and 2001, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2002 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the accompanying financial statement schedule on the valuation and qualifying accounts of ITT Educational Services, Inc. for the years ended December 31, 2002, 2001, and 2000 presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 1 to the consolidated financial statements, the Company changed its method of revenue recognition for certain fees effective January 1, 2000.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Indianapolis, Indiana
January 17, 2003

## 2003 Report of Independent Auditors

To the Board of Directors and Shareholders
of ITT Educational Services, Inc.

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, cash flows and shareholders' equity present fairly, in all material respects, the consolidated financial position of ITT Educational Services, Inc. and its subsidiaries at December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the accompanying financial statement schedule on the valuation and qualifying accounts of ITT Educational Services, Inc. for the years ended December 31, 2003, 2002, and 2001 presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Indianapolis, Indiana
January 16, 2004

## DUTIES OF THE INDIVIDUAL DEFENDANTS

40.     By reason of their positions as officers, directors and/or fiduciaries of ITT and because of their ability to control the business and corporate affairs of ITT, the Individual Defendants owed ITT and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage ITT in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of ITT and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

41.     Each director and officer of the Company owes to ITT and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

42.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of ITT, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with ITT, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations and improper representations of ITT.

43.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ITT, and was at all times acting within the course and scope of such agency.

44.     To discharge their duties, the officers and directors of ITT were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of ITT were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- 23 -

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how ITT conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with all applicable laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

45.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of ITT, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant

- 24 -

Period has been ratified by the remaining Individual Defendants who collectively comprised all of ITT's Board during the Relevant Period.

46.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein, *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal laws, a DOJ investigation, an SEC investigation and the CAG investigation. As a result, ITT has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

        (a)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

        (b)     costs incurred in investigating and defending ITT and certain officers in the class actions, the governmental agency investigations plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

47.     Moreover, these actions have irreparably damaged ITT's corporate image and goodwill. For at least the foreseeable future, ITT will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that ITT's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## AIDING AND ABETTING AND CONCERTED ACTION

48.     In committing the wrongful acts alleged herein, the Individual Defendants and PWC have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to

- 25 -

the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants and PWC further aided and abetted and/or assisted each other in breach of their respective duties.

49. During all times relevant hereto, the Individual Defendants and PWC collectively and individually initiated a course of conduct that was designed to and did: (a) conceal the fact that the Company was improperly falsifying records used as indicators of its operational success in order to create the impression of strong operational and financial performance in order to artificially inflate the price of the Company's shares; (b) maintain the Individual Defendants' executive and directorial positions at ITT and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (c) deceive the investing public, including shareholders of ITT, regarding the Individual Defendants' management of ITT's operations, the Company's financial health and stability and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants and PWC collectively and individually took the actions set forth herein.

50. The Individual Defendants and PWC engaged in a common enterprise and/or common course of conduct which caused the Company to conceal the true fact that ITT was misrepresenting its financial results. In addition, defendants also made other specific, false statements about ITT's financial performance and future business prospects, as alleged herein.

51. The purpose and effect of the Individual Defendants' and PWC's common enterprise, and/or common course of conduct was, among other things: (a) to disguise the Individual Defendants' and PWC's violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement and unjust enrichment; (b) to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and (c) to artificially

- 26 -

inflate the price of ITT common stock so the Individual Defendants could: (i) dispose of over $14 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

52.    The Individual Defendants and PWC accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board of Directors, each of the Individual Defendants and PWC was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein.

53.    Each of the Individual Defendants and PWC aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant and PWC acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

54.    Plaintiff brings this action, in good faith, derivatively in the right and for the benefit of ITT to redress damage suffered and to be suffered by ITT as a direct result of the Individual Defendants' breaches of fiduciary duty, corporate mismanagement, unjust enrichment, abuse of control, fraud, violations of the federal securities laws and PWC's aiding and abetting the Individual Defendants' violations of state and federal law and for professional malpractice.  This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have.  Plaintiff will adequately and fairly represent the interests of ITT and its shareholders in enforcing and prosecuting their rights.  Plaintiff is and has been an owner of the stock of ITT during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the

Company. Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

55.     The Sarbanes-Oxley Act of 2002 placed significant additional responsibilities on the boards of directors of public companies subject to the Act, like ITT, to improve corporate financial accounting and internal controls and to improve corporate financial responsibility and disclosure. This new law was a disaster for the ITT Board, as, despite its public posture of concern over good corporate governance, controls, disclosure and integrity, it was sitting atop a massive ongoing scheme to falsify its Company's reported financial results. Any real compliance with the Sarbanes-Oxley Act would have exposed this scheme, brought it to an end and resulted in embarrassing discharges. Thus, the Board of ITT did not enforce or comply with the Sarbanes-Oxley Act, despite its legal obligation under U.S. law to do so. They will not sue themselves for these failures.

56.     Any request or demand upon the Board of ITT that they sue themselves for the damage that their misconduct has caused the Company would be futile and useless, as it is obvious that they will not do so. In fact, they have not done so. They have also taken steps to avoid any full and unrestricted investigation of their knowledge or participation in the scheme to inflate the profits of ITT's financial statements and placed in overall charge of the operation of ITT on an individual who was deeply involved in the wrongdoing. Another reason the directors will not sue themselves is that by suing themselves, these individuals would void any directors' and officers' liability insurance coverage otherwise available to them, as such policies include the so-called "insured vs. insured" exclusion, by which a suit brought by or on behalf of the Company against them would not be covered by the insurance and thus would expose these individuals to ruinous personal liability.

57.     While ITT and its public shareholders have suffered great damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by

- 28 -

its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct.  These individuals have pocketed millions and millions of dollars of regular and bonus compensation as a result of their incompetent performance and deceptive activities, and several defendants sold ITT stock into the open market at inflated prices while in possession of material, non-public information, while at the same time causing ITT to purchase its own stock out of the open market at inflated prices.

58.     As a result of their concealments and falsifications, many of the directors and managers of ITT held onto their positions of power, prestige and profit at the Company.  The managers of ITT pocketed millions of dollars of salaries, bonuses and insider trading proceeds which would have been denied them had the truth been disclosed.  The directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors of this once stellar company.

59.     The Board of Directors of ITT at the time of the filing of this Complaint consists of the following nine individuals: defendants Champagne, Araskog, Cozzi, Weadock, Fowler, Lau, Miller, Dean and Weber (the "current Board").  Plaintiff did not make any demand on that Board of Directors of ITT to institute this action because such a demand would have been a futile, wasteful and useless act, particularly for the following reasons:

(a)     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors, and attendance at management and Board meetings, each of the current Board members knew the adverse non-public information concerning the Company's violation of federal law, including the improper accounting. While in possession of this material adverse non-public information regarding the Company, the following current Board members of ITT participated in the illegal insider selling:

Champagne, Araskog and Miller. Moreover, defendants Champagne, Araskog and Miller have been named as defendants in the federal securities fraud actions and each of the current Board members received a federal grand jury subpoena. Because these defendants received a personal financial benefit from the challenged insider trading transactions and/or otherwise face the real threat of prosecution for their misconduct, the current Board members are interested and any demand upon them is futile;

(b)     The Compensation Committee has overall responsibility for approving and evaluating the Company's director and officer compensation plans, policies and programs. The Compensation Committee was comprised of defendants Dean, Fowler, Lau, Weadock and Weber. As the members of the Compensation Committee were responsible for designing and implementing programs to prevent insider trading but failed to do so, these defendants are complicit in the misconduct and demand against them is futile;

(c)     The principal professional occupation of defendant Champagne is his employment with ITT, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Accordingly, defendant Champagne lacks independence from defendants Dean, Fowler, Lau, Weadock and Weber, defendants who are not disinterested and who exert influence over defendant Champagne's compensation by virtue of their position on the Compensation Committee. This lack of independence renders defendant Champagne incapable of impartially considering a demand to commence and vigorously prosecute this action;

(d)     According to ITT's 2004 Proxy filed with the SEC on or about March 9, 2004, defendants Araskog, Dean, Miller, Cozzi and Weadock were, during the Relevant Period, members of the Audit Committee. The Audit Committee is responsible for oversight of the integrity of the Company's financial statements and other financial information provided by the Company to any

- 30 -

governmental body or the public; the Company's compliance with legal and regulatory requirements; the Company's systems of internal controls regarding finance, accounting, legal compliance and ethics; and the Company's auditing, accounting and financial reporting processes generally. Nonetheless, the Audit Committee recommended that the Board of Directors include the improper financial statements in ITT's Forms 10-K and Forms 10-Q, as filed with the SEC. By such actions, defendants Araskog, Dean, Miller, Cozzi and Weadock breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them was futile;

(e)     The entire ITT Board of Directors and senior management participated in the wrongs complained of herein and have been subpoenaed by the federal grand jury to testify concerning what the Board knew and why it did not act. These defendants' actions have subjected themselves and ITT to potential criminal liability and millions of dollars in civil liability for possible violations of governmental educational finance and applicable securities laws. Thus, the ITT Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome;

(f)     The Individual Defendants, because of their extensive long-term business, professional and personal relationships, as detailed herein at ¶¶25-33, 35-38, have debilitating conflicts of interest that prevent the current Board members from taking the necessary and proper action on behalf of the Company as requested herein;

(g)     The current Board members, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from ITT's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(h)     In order to bring this suit, all of the current Board members would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they did not do, thereby excusing demand;

(i)     The acts complained of constitute violations of the fiduciary duties owed by ITT's officers and directors and these acts are incapable of ratification;

(j)     Each of the current Board members authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(k)     Any suit by the current Board members to remedy these wrongs would likely expose the current Board members to further liability for violations of the securities laws that would result in civil actions being filed against one or more of the current Board members, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(l)     ITT has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board members have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for ITT any part of the damages ITT suffered and will suffer thereby and have instead acted in unison to prevent the prosecution of these allegations;

(m)     If the directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in

class action complaints for violations of securities laws, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to them. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand was futile; and

(n)     If ITT's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of ITT. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by ITT against these defendants, known as, *inter alia*, the "insured vs. insured" exclusion. As a result, if these directors were to sue themselves or certain of the officers of ITT, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the directors will not cause ITT to sue them, since they will face a large uninsured liability.

60.     Moreover, previous opportunities to seek recovery for the Company's losses have not only been rejected but aggressively stymied by the ITT Board. On or about February 27, 2004, two purported shareholder derivative lawsuits were filed against the entire ITT Board and defendants Champagne, Modany, Lauer and Grossman in the Superior Court of Hamilton County, Indiana. The

- 33 -

derivative lawsuits, which named ITT as a nominal defendant, alleged, among other things, that the Individual Defendants breached their fiduciary duties to ITT, abused their ability to control and influence ITT, grossly mismanaged ITT, caused ITT to waste corporate assets and were unjustly enriched, and that certain Individual Defendants engaged in unlawful insider trading, each of which caused ITT to suffer significant damages. The Company's 2004 Annual Proxy Statement stated that "All of the defendants intend to defend themselves vigorously against the allegations made in the [derivative] complaints" and that despite the fact that the actions were brought *on behalf of ITT, the Company would incur significant defense costs and other expenses in connection with the defense of the defendants in those actions*. Each of the Director Defendants have caused his or her lawyers to move to dismiss those actions, including the allegations against PWC, citing the lack of a "substantial likelihood of personal liability" by the defendants named in that action. In the alternative, defendants in that action have asked that the state derivative actions be stayed until the resolution of their motions to dismiss the federal securities fraud actions currently pending in this District are resolved, regardless of how many months or even years may transpire in the interim. These actions by the Individual Defendants are clearly contrary to the Company's interests and further demonstrate defendants' hostility to this action and that a presuit demand would have been futile.

## FACTUAL ALLEGATIONS

### ITT's Regulatory Environment

61.     ITT is a provider of technology-oriented postsecondary degree programs in the United States. The Company purports to currently offer associate, bachelor and master degree programs and non-degree diplomas to more than 37,000 students through 77 institutes in 30 states, under the "ITT Technical Institute" name.

62.     Most of the education programs offered by ITT are designed to prepare students for technical careers in various fields involving their areas of study, such as entry level positions in network administration, technical support, electronic product design and fabrication, interior design and multimedia communications.

63.     As a for-profit and publicly-traded education program provider, ITT generates revenue and profit by charging its students tuition fees. According to ITT's report on Form 10-K for the FY 2003, as filed with the SEC on February 24, 2004, more than 95% of the Company's revenues were generated from tuition charges. The annual tuition fee for a full time ITT education program is $12,996.

64.     Since ITT's 1994 initial public offering, revenue has tripled and, even with the recent plunge, the stock is up 1,500%. During the same period, the S&P 500 index increased only 150%. But to make the expectations of analysts and the investment community, ITT had to bring in more students. On the other hand, if ITT lowered standards to boost enrollment, it risked churning out students who did not meet the needs of employers. If that happened, placement rates would fall and starting salaries of ITT graduates would lag. To help attract students, ITT employed about 800 sales representatives. That represents nearly a quarter of its full-time work force.

65.     Most of the students enrolled at the Company's institutes rely on favorable low-interest federal loans to pay for their tuition fees. Specifically, according to ITT's 2003 Annual Report, the Company indirectly derived approximately 71% of its revenues from the federal student financial aid programs under Title IV (the "Title IV Programs") of the Higher Education Act of 1965 (the "HEA").

66.     However, the HEA and the regulations promulgated thereunder by the DOE set forth certain standards that a for-profit education program provider such as ITT must comply with in order

to participate in, and obtain revenues from, the Title IV Programs. The purpose of the standards is to prevent education program providers with unacceptable student loan default rates from participating in Title IV Programs and, in general, require the education program providers to satisfy certain criteria related to educational value, administrative capability and financial responsibility.

67.     Under the HEA standards, in order for ITT's institutes to become and remain eligible to participate in Title IV Programs, the institutes must receive state authorization and accreditation by an accrediting commission recognized by the DOE, such as the Accrediting Counsel for Independent Colleges and Schools (the "ACICS"). Specifically, the regulatory framework subjects ITT's institutes to audits and program compliance reviews by the DOE, state agencies and the ACICS that examine, among other things, rates and figures relating to student attendance, grades and academic progress and graduate job placement statistics.

**Violations of Applicable Educational Finance Laws and Regulations**

68.     **The 1999 *Qui Tam* Action**.  A so-called *qui tam* action was filed against ITT on November 5, 1999 in the U.S. District Court for the Southern District of Texas by two former admissions/recruitment employees at an ITT Technical Institute in California (known as "relators") on behalf of themselves and the federal government and was entitled *United States ex rel. Dan Graves and Susan Newman v. ITT Educational Services, Inc., et al.* (the "1999 *Qui Tam* Action"). Specifically, the two former admissions/recruiting employees alleged that ITT used an incentive salary structure that violated the federal ban on providing bonuses, commissions or other payments to recruiters tied to their success in enrolling students at for-profit schools.  For-profit education companies are not allowed to pay bonuses or commissions to recruiters because doing so might encourage the employees to recruit unsuitable students. The 1999 *Qui Tam* Action alleged ITT used an incentive salary structure that provided 5% of earned revenues to ITT recruiters who worked in on-campus student-recruitment offices and 10% of earned revenues to recruiters who visited high

schools and other prospective students. The relators, who worked for ITT until February 2000, alleged the compensation system violated federal law because earned revenue directly related to a recruiter's success in enrolling students.

69.     A *qui tam* action is a civil lawsuit brought by one or more individuals (a *qui tam* "relator") on behalf of the federal government for an alleged submission to the federal government of a false claim for payment. A *qui tam* action is always filed under seal and remains under seal until the DOJ decides whether to intervene in the litigation. Whenever a relator files a *qui tam* action, the DOJ typically initiates an investigation in order to determine whether to intervene in the litigation. If the DOJ intervenes, it has primary control over the litigation. If the DOJ declines to intervene, the relator may pursue the litigation on behalf of the federal government and, if successful, receives a portion of the federal government's recovery.

70.     The 1999 *Qui Tam* Action alleged, among other things, violations of the False Claims Act, 31 U.S.C. §3730, by ITT, defendant Champagne and PWC, its "independent" auditor. The relators sought various forms of recovery on behalf of themselves and the federal government, including: (a) treble the amount of unspecified damages sustained by the federal government; (b) a civil penalty of up to $10,000 for each violation of the False Claims Act; (c) double back pay for plaintiff Susan Newman; and (d) attorney's fees, costs and interest. Defendant Champagne, the ITT Board of Directors and its executive officers received notice of and were briefed concerning the 1999 *Qui Tam* Action by the Company's general counsel. PWC also received notice of the 1999 *Qui Tam* Action in its capacity as a defendant in the action and through discussions with ITT management and attendance at ITT Board meetings.

71.     In March 2003, federal Judge Lee Rosenthal dismissed the 1999 *Qui Tam* Action without evaluating whether ITT's compensation system violated federal law. The relators had

argued ITT violated the False Claims Act because it was collecting millions of dollars in financial aid from the government at a time it was violating its ban on providing incentive pay to recruiters. Judge Rosenthal, however, found that for the relators to make a claim under the Act, they needed to show ITT had falsely certified it was complying with the ban in order to receive the financial aid payments. In regulatory filings and elsewhere, ITT officials had said they believed they were complying with federal education laws, but Judge Rosenthal ruled such general statements were too general to meet the false statement requirements of the False Claims Act. However, this ruling was on appeal had no bearing on the legality of ITT's compensation practices.

72. **The August 2000 Department of Education Investigation/Moratorium.** During 2000, the DOE began investigating the Company's compensation for student recruitment and in the 3Q 2000 the DOE subpoenaed information on the compensation of ITT recruiters. Defendants disclosed that they understood the DOE's investigation to be in relation to the DOJ's investigation into the 1999 *Qui Tam* Action allegations. Specifically, the DOE was investigating whether ITT had violated provisions of the HEA that prohibit a for-profit educational institution from providing commission, bonuses or other incentive payments based directly or indirectly on success in securing enrollments or financial aid to any person or entity engaged in any student recruitment, admission or financial aid awarding activity.

73. By way of a letter dated August 2000, the DOE advised ITT that during the pendency of its investigation, it would not approve any application submitted by ITT with respect to any change of ownership, additional location, certification of initial or continuing eligibility or extension of course or program offerings (such as raising the level of programs offered at an institution) at any ITT educational institution.

74. The disclosure of the DOE probe sent ITT shares down 25% in a single day on heavy volume. However, defendants caused ITT's publicly disseminated SEC filings to state that during December 2001 and January 2002, the DOE recertified all of ITT's Technical Institute campus groups to participate in Title IV Programs and that as part of the recertification, the DOE had approved five ITT Technical Institutes as new additional locations of existing main campuses and an increase in the level of program offerings from associate degree to bachelor degree at one of the Company's campus groups. Defendants also caused ITT to disclose that in July 2002, the DOE approved another ITT Technical Institute as a new additional location of an existing main campus.

75. **The 2000 California Civil Suits.** On March 3, 2000, a civil action entitled *Contreras, et al. v. ITT Educational Services, Inc., et al.*, was filed in the Superior Court of Santa Clara County, California by five former students of the ITT Technical Institute. The suit alleged, among other things, fraud, negligence, negligent misrepresentation, breach of oral contract and statutory violations of the California Business & Professions Code and California Education Code by ITT and three of its employees. The claims related primarily to the Company's marketing and recruitment practices and the quality of its services. The plaintiffs sought compensatory damages, punitive damages, exemplary damages, civil penalties, restitution on behalf of the plaintiffs and all other persons similarly situated, injunctive relief, attorneys' fees and costs. On February 6, 2001, the plaintiffs filed an amended complaint adding 57 plaintiffs, who were current and former students of the ITT Technical Institute in either Santa Clara, California or Hayward, California. Because the written enrollment agreement between each of the plaintiffs and ITT provided that all disputes between the parties would be resolved through binding arbitration, instead of litigation, in May 2001, the court compelled the arbitration of each plaintiff's claims. In July 2002, defendants agreed to settle the claims of 58 of the plaintiffs for an undisclosed amount. In December 2002, the Company

- 39 -

discontinued admitting new students at the Company's Hayward, California and Santa Clara, California ITT Technical Institute campuses.

76.    **The 2002 California Attorney General Investigation**. In October 2002, the CAG notified ITT and the Individual Defendants that the CAG had initiated an investigation of the ITT Technical Institutes in California in response to a *qui tam* action filed against ITT under state and/or federal False Claims Acts. Based on the information that the CAG requested and the advice of ITT's general counsel, the Individual Defendants understood in October 2002 (at the very latest) that the CAG was investigating, among other matters, whether one or more of ITT's California ITT Technical Institutes: (a) falsified records relating to student attendance, grades and academic progress; (b) falsified student grade point average calculations used to qualify students for financial aid under the State's Cal Grant Program; and (c) retaliated against employees who may have complained about those alleged acts. Based on the results of ITT's "internal investigation" initiated after the commencement of the CAG's investigation, but without public disclosure of that investigation, the Individual Defendants had determined by March 9, 2004 that they did not "believe that there is any merit to any claims that may be alleged with respect to those matters and that, therefore, the CAG investigation and any *qui tam* actions that may be associated with the investigation [would] not have a material adverse effect on [ITT's] financial condition, results of operations or cash flows."

77.    **The 2003-2004 Department of Justice Investigation**. Despite having declined to intervene in the 1999 *Qui Tam* Action, beginning by at least the fall of 2003, the DOJ began its own formal investigation into whether ITT broke federal law by doling out to its student recruiters a percentage of revenue they brought in. Jeff Weber, commissioner of the Indiana Commission on Proprietary Education, has said his office received a subpoena in October 2003 for all of its ITT

records. The Washington, D.C.-based ACICS, which accredits the 77 ITT Technical Institutes, did not receive a subpoena, but says it had been cooperating with the DOE since September 2002 according to its Executive Director Steven A. Eggland. ITT's senior executives necessarily received notice of the DOJ's actions from the organizations from which records were sought directly from the DOJ.

78.     On February 25, 2004, federal agents raided ITT's corporate headquarters and 10 of its 77 ITT Technical Institutes nationwide armed with search warrants. On that same date, ITT, each Director Defendant and certain executive officers and some of ITT's other employees each received a federal grand jury subpoena that was issued, along with the search warrants, by the U.S. District Court for the Southern District of Texas – *the same court where the 1999 Qui Tam Action had been filed*. A federal grand jury is an investigatory body used only in criminal probes and while both civil and criminal investigations can result in fines and other penalties, only criminal probes can result in an individual's imprisonment. The search warrants and subpoenas sought broad categories of documents, including documents containing information relating to ITT's figures and rates for placement, retention, graduation and attendance, recruitment and admissions materials, student grades, graduate salaries, transferability of credits to other institutions and personnel records. ITT was told that the DOJ was investigating claims alleging, among other matters, falsification of records relating to student attendance, grades and academic progress and graduate job placement statistics and fraudulent misrepresentations regarding the transferability of credits.

79.     Federal investigators normally would gather information through subpoenas so the fact that investigators instead used a search warrant to seize documents suggests they feared the information would otherwise have been destroyed or withheld. Grand juries have wide latitude to subpoena information they deem relevant to an inquiry. But to receive a search warrant, a prosecutor

must go before a judge and show probable cause a crime has been committed. The prosecutor would have to identify what he wanted to collect, and would have to explain why he did not believe the less-intrusive subpoena process would accomplish the same thing.

**Violations of the Federal Securities Laws**

80.     Defendants actively concealed the commencement of the CAG investigation in October 2002 and the DOJ investigations from the investing public by not disclosing them in SEC filings and not requiring that they be disclosed in Company press releases.  Instead, defendants caused ITT to report quarter after quarter of increased revenues and earnings during the Relevant Period without disclosing that they had caused the Company:  (a) to systematically falsify records, such as those relating to enrollment, graduation and job placement rates, in order to artificially inflate its reported operational and financial performance;  (b) derive a material portion of the Company's reported revenues through fraudulent business practices, such as federal grants and financial aid payments that were secured through falsified records;  (c) inaccurately portray the results of the Company's operations, attributing a material portion of those results to prohibited practices;  and (d) fail to prepare and report the Company's financial results in accordance with GAAP and fail to fairly present its actual financial results or condition.  As a result of defendant's misstatements, the Company's financial reports issued in the following press releases and filed with the SEC during the Relevant Period were materially false and misleading.

**The Third Quarter of 2002**

81.     On October 17, 2002, the Individual Defendants caused ITT to issue a press release entitled, "ITT Educational Services, Inc. Reports Record Increase in Third Quarter Earnings per Share."  The press release stated in relevant part that ITT

> reported its financial results for the third quarter and the first nine months of 2002. During the three months ended September 30, 2002, earnings per share ("EPS") increased 36.8 percent to $0.26 compared to $0.19 in the same period of 2001. As of

September 30, 2002, total student enrollment at the company's ITT Technical Institutes, excluding international enrollments, increased 6.2 percent to 33,799 compared to 31,815 as of the same date in 2001. This 6.2 percent increase in total student enrollment resulted from a 6.1 percent increase in new student enrollment to 10,660 in the third quarter of 2002 compared to 10,046 in the third quarter of 2001, and a 6.3 percent increase in continuing students to 23,139 in the third quarter of 2002 compared to 21,769 in the third quarter of 2001. Revenues in the third quarter of 2002 increased 13.4 percent to $120.5 million compared to $106.3 million in the third quarter of 2001. During the third quarter of 2002, operating income increased 36.0 percent to $18.8 million compared to $13.9 million in the same period of 2001.

82.     Defendant Waddles commented favorably on the Company's results, stating as follows in relevant part:

"ITT/ESI is implementing internal growth initiatives that do not totally depend on a technology sector turnaround," said Omer Waddles, president and COO. "In addition, our new marketing campaigns have produced increased lead flow over the last several quarters. We continued our geographic expansion by opening three new colleges in the third quarter of 2002, which raises to 74 the number of ITT Technical Institutes. We are developing six new degree programs of study. These programs are in addition to the five new programs that we have begun to rollout and plan to begin offering at additional colleges at various times over the next 12 to 15 months. At the same time, we are seeking the appropriate regulatory approvals to increase the number of our colleges offering bachelor degree programs from 29 at the end of 2001 to 57 by the end of 2003. At this time, 39 of our colleges are approved to offer bachelor degree programs. We are beginning to ramp up our online delivery of bachelor degree programs and continue to test a hybrid delivery model of courses in our curricula. Under the hybrid delivery model, certain courses are taught in residence on campus and others are taught online over the Internet. We are pursuing international opportunities in addition to those we have initiated in China, India, Bangladesh, Nepal and Sri Lanka. We chose not to include foreign enrollments in our third quarter results, because they do not yet represent a significant number. As a result of our growth initiatives, our goal is to increase new student enrollment in the fourth quarter of 2002 in the range of 6 to 9 percent compared to the fourth quarter of 2001."

83.     On October 18, 2002, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC which reiterated the financial information reported in the October 17, 2002 press release and was signed and certified under the §302 of the Sarbanes Oxley Act by defendant Champagne. The 3Q 2002 10-Q represented that the financial results

contained therein were prepared in accordance with GAAP and fairly presented the Company's

results.

84.     Neither the October 17, 2002 press release nor the 3Q 2002 10-Q made any reference

to the October 2002 CAG investigation or the DOJ's investigation.

85.     On this and other positive news, the Company's stock price increased over 25%, from

approximately $15 per share to well over $20 per share, by the end of October 2002.

**Fourth Quarter and Fiscal Year 2002**

86.     On January 23, 2003, the Individual Defendants caused ITT to issue a press release

entitled, "ITT Educational Services, Inc. Reports Year-End Results; Earnings Per Share in 2002

Increased 34.3 Percent; Fourth Quarter New Student Enrollment Increased 11.2 Percent." The press

release stated in relevant part that ITT's

> earnings per share ("EPS") in 2002 were $0.94, a 34.3 percent increase compared to
> $0.70 per share in 2001. For the three months ended December 31, 2002, EPS were
> $0.40, a 29.0 percent increase compared to $0.31 per share in the same period of
> 2001. As of December 31, 2002, total student enrollment at the company's ITT
> Technical Institutes, excluding international enrollments, increased 6.0 percent to
> 32,631 compared to 30,778 as of December 31, 2001. This 6.0 increase in total
> student enrollment resulted from an 11.2 percent increase in new student enrollment
> to 5,710 in the fourth quarter of 2002 compared to 5,133 in the fourth quarter of
> 2001, and a 5.0 percent increase in continuing students to 26,921 in the fourth quarter
> of 2002 compared to 25,645 in the fourth quarter of 2001

87.     The January 23, 2003 release also advised that "Kevin M. Modany [had] been

appointed senior vice president and chief financial officer of ITT Educational Services, Inc. by its

board of directors."

88.     On February 26, 2003, the Individual Defendants caused the Company to file its

annual report on Form 10-K with the SEC. The 2002 10-K reiterated the financial information

reported in the January 23, 2003 press release and was signed by defendants Champagne, Waddles,

Modany, Araskog, Dean, Fowler, Miller, Weadock and Weber and certified pursuant to §302 of the

- 44 -

Sarbanes Oxley Act by defendants Champagne, Waddles and Modany. The 2002 10-K included a

letter from PWC, the Company's outside auditors, representing that the financial results contained

therein were prepared in accordance with GAAP and fairly presented the Company's results:

> To the Board of Directors and Shareholders
> of ITT Educational Services, Inc.
>
> In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, cash flows and shareholders' equity present fairly, in all material respects, the consolidated financial position of ITT Educational Services, Inc. and its subsidiaries at December 31, 2002 and 2001, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2002 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the accompanying financial statement schedule on the valuation and qualifying accounts of ITT Educational Services, Inc. for the years ended December 31, 2002, 2001, and 2000 presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> As discussed in Note 1 to the consolidated financial statements, the Company changed its method of revenue recognition for certain fees effective January 1, 2000.
>
> /s/ PricewaterhouseCoopers LLP
> PricewaterhouseCoopers LLP
> Indianapolis, Indiana
> January 17, 2003

89. Neither the January 23, 2003 press release nor the 2002 10-K discussed or made

reference to the 2002 CAG investigation or the DOJ's investigation.

**The First Quarter of 2003**

90.     On April 17, 2003 the Individual Defendants caused ITT to issue a press release

entitled, "ITT Services, Inc. Reports EPS Increased 35.7 Percent in 2003 First Quarter" announcing

results for the 1Q 2003, representing that the Company experienced strong growth in EPS, revenues,

operating income and new enrollments, as follows:

> ITT Educational Services Inc., a leading provider of technology oriented postsecondary degree programs, today reported that earnings per share ("EPS") in the first quarter of 2003 increased 35.7 percent to $0.19 compared to $0.14 in the first quarter of 2002. New student enrollment in the first quarter of 2003, excluding international enrollments and enrollments at two of its institutes that are gradually ceasing operations, increased 7.4 percent to 7,213 compared to 6,714 in the first quarter of 2002. As of March 31, 2003, total student enrollment, excluding international enrollments and enrollments at two of its institutes that are gradually ceasing operations, increased 4.7 percent to 31,966 compared to 30,528 as of March 31, 2002.
>
> Revenues in the first quarter of 2003 increased 13.8 percent to $122.4 million compared to $107.5 million in the first quarter of 2002. During the first quarter of 2003, operating income increased 38.7 percent to $13.7 million compared to $9.9 million in the same period of 2002. Operating margin increased 200 basis points in the first quarter of 2003 to 11.2 percent compared to 9.2 percent in the first quarter of 2002. Net income for the three months ended March 31, 2003 increased 35.5 percent to $8.7 million compared to $6.4 million in the same period of 2002.

91.     Defendant Champagne commented favorably on the Company's results, stating as

follows in relevant part:

> Rene R. Champagne, chairman and CEO of ITT/ESI said, ***"Our strong financial performance in the first quarter of 2003 that resulted in a 35.7 percent increase in EPS demonstrates that we were able to successfully navigate the challenges posed by high unemployment, softness in the technology sector and the effects of the war in Iraq on the national economy and consumer confidence. Our ability to increase new student enrollment by 7.4 percent in the first quarter is a testament to our 10 point growth strategy and the effectiveness of our marketing campaign.*** Lead generation in the first quarter was strong and our lead conversion rate continued to improve.

92.     On April 28, 2003, the Individual Defendants caused ITT to file with the SEC its

Form 10-Q for 1Q 2003 which reiterated the financial information contained in the April 17, 2003

press release and was signed by defendant Modany and certified pursuant to §302 of the Sarbanes-Oxley Act by defendants Champagne, Waddles and Modany. In the section of 1Q 2003 10-Q titled "Basis of Presentation," the Company represented that the financial information contained therein was prepared in accordance with GAAP and fairly presented the Company's results.

93.     The discussion of pending legal proceedings in the 1Q 2003 10-Q for stated that on March 31, 2003 the court hearing the 1999 *Qui Tam* Action had entered a final judgment dismissing all claims with prejudice against ITT, Champagne and PWC for failure to state a claim. *However, any discussion of the CAG investigation and/or the ongoing DOJ investigation that arose out of the 1999 Qui Tam Action was conspicuously missing.* Defendants also caused ITT to disclose that in March 2003, the DOE officially closed its investigation into ITT's method of compensating student recruiters and whether it was in compliance with the provision of the HEA that prohibits a for-profit institution from providing any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any person or entity engaged in any student recruitment, admission or financial aid awarding activity. Defendants also caused ITT to disclose that the DOE had "closed its investigation without issuing any findings, and it formally withdrew, lifted and removed all sanctions and limitations" contained in the August 2000 letter limiting ITT's access to Title IV Programs and that ITT had paid an undisclosed fee to have the removal of the sanctions expedited. *Again, despite defendants' discussion of legal proceedings and potential material effects on financial results, there was no notice of the pendency of the CAG investigation, which was now well underway, or the ongoing DOJ investigation.*

**The Second Quarter of 2003**

94.     On July 17, 2003, the Individual Defendants caused ITT to issue a press release entitled, "ITT Educational Services, Inc. Reports 50 Percent Increase in EPS in Second Quarter

- 47 -

2003, New Student Increase of 15.8 Percent" announcing strong results for 2Q 2003, reporting, in

part, the following results:

> ITT Educational Services, Inc., a leading provider of technology-oriented
> postsecondary degree programs, today reported that earnings per share ("EPS") in the
> second quarter of 2003 increased 50.0 percent to $0.21 compared to $0.14 in the
> second quarter of 2002. New student enrollment in the second quarter of 2003,
> excluding international enrollments and enrollments at two of its institutes that have
> stopped recruiting new students and are gradually ceasing operations, increased 15.8
> percent to 8,665 compared to 7,485 in the same period of 2002. Total student
> enrollment as of June 30, 2003, excluding international enrollments and enrollments
> at the two institutes that are gradually ceasing operations, increased 6.6 percent to
> 33,153 compared to 31,113 as of June 30, 2002.

95. Defendant Champagne highlighted the Company's accomplishments during the

quarter, commenting as follows:

> Rene R. Champagne, chairman and CEO of ITT/ESI said, *"We experienced
> yet another strong financial performance in the second quarter of 2003 that
> resulted in a 50.0 percent increase in EPS. Our EPS of $0.21 in the second
> quarter of 2003 exceeded analysts' consensus estimates by 2 cents per share. This
> performance was driven primarily by increased total student enrollment, tuition
> increases and greater leveraging of the Company's operating costs.* Lead
> generation in the second quarter remained strong and our lead conversion rate
> continued to improve, as evidenced by a 15.8 percent increase in new student
> *enrollment. New student enrollment and total student enrollment in the first six
> months of 2003*, excluding international enrollments and enrollments at the two
> institutes that are gradually ceasing operations, *increased 11.8 percent compared to
> the same period in 2002 and 5.9 percent, respectively."*

96. On July 17, 2003, the Individual Defendants caused ITT to file with the SEC its Form

10-Q for 2Q 2003, which reiterated the financial information contained in the July 17, 2003 press

release and was signed by defendant Modany and certified pursuant to §302 of the Sarbanes-Oxley

Act by defendants Champagne, Waddles and Modany. In the section of the 10-Q for 2Q 2003 titled

"Basis of Presentation," the Company represented that the financial information contained therein

was prepared in accordance with GAAP and fairly presented the Company's results.

97. Neither the July 17, 2003 press release nor the 2Q 2003 10-Q discussed or made

reference to the October 2002 CAG investigation nor the ongoing DOJ investigation. As a result of

the Individual Defendants' false and misleading, albeit positive, statements pertaining to 2Q 2003,

ITT stock rocketed from its opening stock price of $31.50 on July 17, 2003 to closing at $36.13 on

that very same day. Between July 24, 2003 and August 7, 2003 defendant Waddles sold 100,000

shares of ITT common stock at $38.95 per share for total proceeds of $3,904,389 and on August 13,

2003 defendant Lauer sold 40,000 shares of ITT common stock at $40.83 per share for total

proceeds of $1,632,258. Each of these sales was completed while the defendant was in possession of

the material, non-public adverse information identified herein, while the defendant knew the

information had not been disclosed and while the Company's stock price was artificially inflated due

to the non-disclosure of that information.

**The Third Quarter of 2003**

98.    By October 2003, ITT stock was artificially inflated and trading in the mid to high

$40 range. On October 15, 2003, ITT stock closed at $46.37.

99.    On October 16, 2003, the Individual Defendants caused ITT to issue a press release

entitled, "ITT Educational Services, Inc. Reports 30.8 Percent Increase in EPS in Third Quarter

2003, New Student Increase of 20.7 Percent" announcing, in part, continued growth in the

Company's 3Q 2003, as follows:

> ITT Educational Services, Inc., a leading provider of technology-oriented
> postsecondary degree programs, today reported its financial and operating results for
> the third quarter and the first nine months of 2003. During the three months ended
> September 30, 2003, earnings per share ("EPS") increased 30.8 percent to $0.34
> compared to $0.26 in the same period of 2002. EPS in the first nine months of 2003
> increased 38.9 percent to $0.75 compared to $0.54 in the comparable period of 2002.
> In the third quarter of 2003, new student enrollment (excluding international
> enrollments and enrollments at two of its institutes that are gradually ceasing
> operations) increased 20.7 percent to 12,690 compared to 10,518 in the same period
> of 2002. Total student enrollment as of September 30, 2003 (excluding international
> enrollments and enrollments at the two institutes that are gradually ceasing
> operations) increased 10.8 percent to 36,947 compared to 33,352 as of September 30,
> 2002.

100.     Defendant Champagne attributed the results to strong and growing demand for the

Company's services:

Rene R. Champagne, chairman and CEO of ITT/ESI said, *"Our strong enrollment and financial performance in the third quarter and first nine months of 2003 reflects the solid demand we have experienced for our programs of study*. These results position us well to meet or exceed our internal financial goals for the full year of 2003 and the full year of 2004."

101.     On October 17, 2003, the Individual Defendants caused ITT to file with the SEC its

Form 10-Q for 3Q 2003, which reiterated the financial information contained in the October 16,

2003 press release and was signed by defendant Modany and certified pursuant to §302 of the

Sarbanes-Oxley Act by defendants Champagne, Waddles and Modany.  In the section of the 3Q

2003 10-Q titled "Basis of Presentation," the Company represented that the financial information

contained therein was prepared in accordance with GAAP and fairly presented the Company's

results.

102.     Neither the October 16, 2003 press release nor the 3Q 2003 10-Q discussed or made

reference to the 2002 CAG investigation or the ongoing DOJ investigation.  On October 22, 2003

defendant Miller sold 10,000 shares of ITT common stock at $48.85 per share for total proceeds of

$488,091; on October 22, 2003 defendant Grossman sold 10,000 shares of ITT common stock at

$48.43 per share for total proceeds of $484,253; on October 24, 2003 defendant Araskog sold 24,000

shares of ITT common stock at $48.54 per share for total proceeds of $1,161,869; and between

October 29, 2003 and November 5, 2003 defendant Champagne sold 75,000 shares of ITT common

stock at $50.44 per share for total proceeds of $3,783,288.  Each of these sales was completed while

the defendant was in possession of the material, non-public adverse information identified herein,

while the defendant knew the information had not been disclosed and while the Company's stock

price was artificially inflated due to the non-disclosure of that information.

## The Fourth Quarter and Year 2003

103.     On January 22, 2004, the Individual Defendants caused the Company to issue a press

release entitled, "ITT Educational Services, Inc. Reports Record Enrollment and EPS for Fourth

Quarter and Full Year 2003" reporting "Record Enrollment" and the following results for the

4Q 2003 and FY 2003:

ITT Educational Services, Inc., a leading provider of technology-oriented
postsecondary degree programs, today reported its financial and operating results for
its fourth quarter and FY ending December 31, 2003. During the three months ended
December 31, 2003, earnings per share ("EPS") increased 30 percent to $0.52
compared to $0.40 in the same period of 2002. EPS for its 2003 fiscal year increased
35.1 percent to $1.27 compared to $0.94 in 2002. In the fourth quarter of 2003, new
student enrollment (excluding international enrollments and enrollments at two of its
institutes that are gradually ceasing operations) increased 29.3 percent to 7,277
compared to 5,628 in the same period of 2002. Total student enrollment as of
December 31, 2003 (excluding international enrollments and enrollments at the two
institutes that are gradually ceasing operations) increased 14.6 percent to 36,901
compared to 32,197 as of December 31, 2002.

104.     Defendant Champagne attributed the result to successful implementation of the

Company's growth plan:

Rene R. Champagne, chairman and chief executive officer of ITT/ESI said, *"Our 10
point growth plan gained traction in 2003 and is helping to produce a pipeline of
new growth initiatives that we believe should result in enrollment growth over the
next 24 to 36 months."*

105.     On January 22, 2004, ITT stock closed at $53.30.

106.     On February 24, 2004, the Individual Defendants caused the Company to file its

annual report on Form 10-K with the SEC. The 2003 10-K reiterated the financial information

reported in the January 22, 2004 press release and was signed by defendants Champagne, Waddles,

Modany, Araskog, Cozzi, Dean, Fowler, Lau, Miller, Weadock and Weber and certified pursuant to

§302 of the Sarbanes-Oxley Act by defendants Champagne, Waddles and Modany. The 2003 10-K

included a letter from PWC, the Company's outside auditors, representing that the financial results

contained therein were prepared in accordance with GAAP and fairly presented the Company's

results:

> To the Board of Directors and Shareholders
> of ITT Educational Services, Inc.
>
> In our opinion, the accompanying consolidated balance sheets and the related
> consolidated statements of income, cash flows and shareholders' equity present
> fairly, in all material respects, the consolidated financial position of ITT Educational
> Services, Inc. and its subsidiaries at December 31, 2003 and 2002, and the results of
> their operations and their cash flows for each of the three years in the period ended
> December 31, 2003 in conformity with accounting principles generally accepted in
> the United States of America. In addition, in our opinion, the accompanying
> financial statement schedule on the valuation and qualifying accounts of ITT
> Educational Services, Inc. for the years ended December 31, 2003, 2002, and 2001
> presents fairly, in all material respects, the information set forth therein when read in
> conjunction with the related consolidated financial statements. These financial
> statements and financial statement schedule are the responsibility of the Company's
> management; our responsibility is to express an opinion on these financial statements
> and financial statement schedule based on our audits. We conducted our audits of
> these statements in accordance with auditing standards generally accepted in the
> United States of America, which require that we plan and perform the audit to obtain
> reasonable assurance about whether the financial statements are free of material
> misstatement. An audit includes examining, on a test basis, evidence supporting the
> amounts and disclosures in the financial statements, assessing the accounting
> principles used and significant estimates made by management, and evaluating the
> overall financial statement presentation. We believe that our audits provide a
> reasonable basis for our opinion.
>
> /s/ PricewaterhouseCoopers LLP
> PricewaterhouseCoopers LLP
> Indianapolis, Indiana
> January 16, 2004

107. Neither the January 22, 2004 press release nor the 2003 10-K discussed or made

reference to the 2002 CAG investigation or the ongoing DOJ investigation, despite the fact that the

Company's own internal investigations were now well underway.

108. By February 2004, the Individual Defendants' misrepresentations caused ITT stock to

trade in the mid $50's. On February 23, 2004, ITT stock closed at $57.87. On January 28, 2004

defendant Miller sold 8,000 shares of ITT common stock at $55.37 per share for total proceeds of

$443,177 and between February 2 and 3, 2004 defendant Lauer sold 39,700 shares of ITT common stock at $56.09 per share for total proceeds of $2,224,067. Each of these sales was completed while the defendant was in possession of the material, non-public adverse information identified herein, while the defendant knew the information had not been disclosed and while the Company's stock price was artificially inflated due to the non-disclosure of that information.

109. The representations contained in the above press releases and SEC filings issued during the Relevant Period were each materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, among others:

(a) during the Relevant Period ITT had systematically falsified records, such as those relating to enrollment, graduation and job placement rates, in order to artificially inflate its reported operational and financial performance;

(b) a material portion of the Company's reported revenues were derived through fraudulent business practices, such as federal grants and financial aid payments that were secured through falsified records;

(c) the Company's reported results did not accurately portray the Company's operations because a material portion of those results were attributable to prohibited practices; and

(d) that the Company's results were not prepared and reported in accordance with GAAP and did not fairly present its actual financial results or condition.

## The Market's Swift Reaction to
## Revelations of Defendants' Misconduct

110. On February 25, 2004, before the opening of ordinary trading, the Individual Defendants caused the Company to issue a press release entitled, "ITT Educational Services, Inc. Reports that It Has Been Served with a Search Warrant and Related Subpoenas from the U.S.

District Court in Texas." ITT Educational was served at its corporate headquarters and several of its

schools. In relevant part, the Company stated as follows:

> ITT Educational Services, Inc. reported today that federal agents are executing a search warrant at the company's corporate offices in Indianapolis and at several ITT Technical Institutes. The search warrant was issued by the U.S. District Court, Southern District of Texas, located in Houston, Texas. The search warrant and related grand jury subpoenas relate to information and documentation regarding placement figures and rates, retention figures and rates, graduation figures and rates, attendance figures and rates, recruitment and admissions materials, student grades, graduate salaries and transferability of credits to other institutions.
>
> Rene R. Champagne, Chairman and Chief Executive Officer of ITT/ESI said, "Federal agents are executing the search warrant this morning and we are fully cooperating with the agents with regard to the requests identified in the warrant and related subpoenas. We have not been informed of any specific allegations or charges at this time."

111.    In reaction to this announcement, the price of ITT common stock plummeted, falling

from $57.40 per share on February 24, 2004 to close at $38.50 on February 25, 2004 – a one-day

drop of 33% on unusually heavy trading volume.

112.    On March 4, 2004, ITT was notified by the SEC that it had initiated an inquiry into

the allegations being investigated by the DOJ.

113.    ITT, Champagne, Waddles and Modany were also named as defendants in several

securities fraud class action lawsuits filed beginning on February 26, 2004 in the U.S. District Court

for the Southern District of Indiana. Those actions allege, among other things, that the Individual

Defendants violated §§10(b) and 20(a) of the 1934 Act, and Rule 10b-5 promulgated thereunder, by

employing devices, schemes and artifices to defraud, making untrue statements of material fact

and/or omitting to state material facts necessary to make statements not misleading and engaging in

acts, practices and a course of business which operated as a fraud and deceit on the purchasers of

ITT's securities in an effort to maintain artificially high market prices for the Company's common

stock. The putative class period is from April 17, 2003 through February 25, 2004. The plaintiffs in

those actions seek, among other things, hundreds of millions of dollars in compensatory damages, interest, costs and attorneys' fees and extraordinary equitable and/or injunctive relief. In disclosing the existence of these lawsuits in the Company's Annual Proxy Statement to Shareholders, the Individual Defendants conceded that "the ultimate outcome of these or other actions (including other actions under federal or state securities laws) [could] have a material adverse effect on [ITT's] financial condition or results of operations." Not only has ITT been exposed to the risk of millions of dollars of potential liability, but because it is named as a defendant in those actions it is excluded from any recovery the plaintiff class obtains.

114.    The Individual Defendants caused ITT to disclose in its Proxy filed on March 9, 2004 that *it was not only being investigated by the DOJ, but also the SEC for potential violations of the federal securities laws.* And, the CAG investigation that had begun in October 2002 but had since been concealed from the public, despite the fact that defendant Araskog has admitted that the Board was briefed several times on the CAG by the Company's general counsel, was finally disclosed.

115.    On March 15, 2004, *Bloomberg* issued an article entitled, "Top ITT Tech Officials Accused in Stock Sale" and reported, in part, as follows:

Eight officials at ITT Educations Services Inc. sold more than $27 million of stock in the 17 months between the time the technical school operator learned of a California attorney general's investigation and its first disclosure of the probe to investors last week.

Chief Executive Officer Rene Champagne, 62, and director Rand Araskog, 72, are among those who sold shares after the company was told of the investigation in October 2002....

The company determined the state probe wasn't a material fact that needed to be publicly disclosed, ITT Educational spokeswoman Nancy Brown said.

*      *      *

"We did our own investigation into it and found that it didn't have material facts that would impact the company," ITT Educational President Omer Waddles, 44,

- 55 -

said in a telephone interview. He reported in SEC filings that he sold 100,000 shares last July and August 2003 for $3.9 million.

Officials at the Carmel, Indiana-based company were aware of the non-public state investigation before they sold their shares, Brown said.

*     *     *

Champagne, chairman and CEO, sold 135,000 shares for a total of $5.4 million in February, October and November of 2003, according to SEC filings. Champagne declined to comment, Brown said.

Director Araskog a former director of the New York Stock Exchange, sold 223,900 shares in February and October 2003 for a total of $6.4 million.

In an initial phone interview, Araskog, 72, said that he didn't know about the California allegations at the time he sold the stock.

"Everything I did has been absolutely proper," Araskog said. "I was not aware of anything other shareholders weren't aware of." I was equal to other shareholders."

In a subsequent conversation, he said the California investigation was discussed at several board meetings and directors were told the investigation was determined not to be material.

"I would not have received approval to sell if our corporate counsel thought it was material," he said.

116.    On March 16, 2004, the *Associated Press* issued an article entitled, "ITT chief: Too early to gauge impact of federal probe, lawsuits," which disclosed that the ***ITT's Board "authorized the buyback of up to 4.2 million shares of ITT stock, the value of which has fallen nearly 53 percent in the past month."***

117.    On March 16, 2004, ITT stock closed at $28.75, having lost more than 50% of its value since its February 12, 2004 when it reached a high of $60.75. As a result, well over $1.4 billion of the Company's market capitalization simply vanished.





118.    On March 17, 2004, the *Indianapolis Star* reported in an article entitled, "ITT's CEO

is coy about his plans to buy stock," as follows:

Documents filed with the Securities and Exchange Commission show that Champagne has done very little buying or selling of the company's stock. But he has steadily accumulated holdings in the company, which now operates 77 technical institutes nationwide, since its initial public offering in 1994.

Champagne has purchased shares twice since then. He bought 10,000 in December 1994, which after two stock splits are now equal to 45,000 shares. He bought another 6,000 in April 1999, which are now equal to 12,000 shares, according to SEC documents.

Champagne has received company stock options each year as part of his compensation. Those options have grown from 56,250 in January 1997 to more than 808,000 as of February 2003, according to the company's proxy statements.

**But his options shrank for the first time in 2003 as Champagne exercised and sold 135,000 shares for a total of $5.4 million.**

\*      \*      \*

*[David] Treier, [spokesman for ITT Educational] would not say what the reason was for Champagne's heightened trading activity in 2003. He declined to make Champagne available for comment.*

*Champagne's selling capitalized on ITT Educational's strong stock performance of 2003. During the year, ITT Educational's shares doubled in value--from $23.56 to $46.97.*

*But the sales also came even as California's attorney general was investigating ITT Educational's schools in California, a fact the company first disclosed last week. The California investigation began in October 2002.*

\*      \*      \*

*Since that time, Champagne and seven other ITT Educational officials sold more than $27 million in stock.*

*Concerted selling by company insiders is usually not a good sign ....*

119.   On April 22, 2004, the Individual Defendants caused ITT to issue a press release

reporting its 4Q results which disclosed that *the Company had taken a $9.7 million charge to cover*

*estimated legal costs associated with the DOJ, SEC and derivative and class litigations pertaining*

*to ITT. The press release also disclosed that the PWC refused to certify the Company's 1Q 2004*

*financial results*:

> "To date, we have not experienced any significant effects on our operations as a result of the DOJ Investigation. The Special Committee of our Board of Directors will not complete its independent investigation into the facts and circumstances alleged to be the subject matter underlying the DOJ Investigation until after the date our 2004 first quarter Form 10-Q is due to be filed with the SEC. As a result, our independent auditor has informed us that they will be unable to complete their interim financial review of our first quarter financial statements prior to the completion of the Special Committee's investigation and before we file our 2004 first quarter Form 10-Q with the SEC," Modany reported.

120.   The April 22, 2004 press release also warned that the fruition of any of the following

risks arising out of defendants' misconduct could cause further substantial damage to ITT's business

and reputation, *including a possible restatement of previously issued financial results*:

(a)      "the results of the qui tam action brought under the False Claims Act, 31 U.S.C. Section 3730, in which the company is a defendant which, if adversely determined, could result in a demand for repayment of federal student financial aid funds, trebled under the False Claims Act, and penalties";

(b)      "the effects of the federal grand jury investigation of the company which could result in monetary fines or penalties or other sanctions imposed on the company (including the company's loss of eligibility to participate in student financial aid programs) that could materially adversely affect the company's financial condition and operations";

(c)      "the results of the Securities and Exchange Commission's inquiry into the allegations being investigated by the federal grand jury which could result in the restatement of the company's financial statements, monetary fines or penalties or other sanctions that could materially adversely affect the company's financial condition and operations"; or

(d)      "the results of the securities class action and shareholder derivative lawsuits filed against the company which, if adversely determined, could have a material adverse effect on the company's financial condition and results of operations."

121.     The Company's 1Q 2004 10-Q filed on April 27, 2004 disclosed that: "In October 2002, the CAG informed us that it had initiated an investigation of our ITT Technical Institutes in California." Defendants also caused ITT to disclose that they and ITT "believe that the CAG's investigation is in response to one or more *qui tam* actions filed against us under the state and/or federal False Claims Acts."

122.     On July 12, 2004, the Company announced that the employment of President, Chief Operating Officer and director Waddles had terminated.

123. On July 21, 2004, the Company issued its 2Q 2004 financial results. In that release defendants indicated the reserve for legal fees related to the investigations of the DOJ, SEC, CAG and related shareholder actions had increased to $15.3 million in the first six months of 2004, stating they were growing "much larger than the company has previously experienced." In fact, the legal fees were growing so enormous that defendants felt the need to report what the Company's financial results would have been but-for these legal fees. Following the release of the Company's 2Q 2004 financial results, on July 22, 2004, *Dow Jones News Wires* issued an article entitled, "ITT Educational Sees Some Student Impact From Inquiries," explaining that ITT had *"seen a small portion of its students leave due to negative publicity surrounding an ongoing federal inquiry into alleged manipulation of student attendance records, grades and other related data,"* and quoting Champagne as stating that the issue was having an impact on most of the Company's schools and not just those raided by federal agents. It was reported that the comments came after several analysts questioned a decline in the Company's 2Q student retention.

## VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES

124. Throughout the Relevant Period, the Individual Defendants caused the Company to issue materially false and misleading statements and omitted to disclose material information regarding ITT's financial status and used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate and report revenues and earnings.

125. Specifically, the Company's financial statements falsely stated that revenue was being recognized when earned despite the fact that defendants were really recognizing revenues obtained only by making false and misleading reports of student enrollment and success. For instance, the 2002 10-K falsely stated that:

> *Recognition of Revenues.* Tuition revenues are recorded on a straight-line basis over the length of the applicable course. If a student discontinues training, the tuition revenue related to the remainder of that academic quarter is recorded with the

amount of refund resulting from the application of federal, state or accreditation requirements or our refund policy recorded as an expense. On an individual student basis, tuition earned in excess of cash received is recorded as accounts receivable, ***and cash received in excess of tuition earned is recorded as deferred revenue***.

126. GAAP is recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. GAAP consists of those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting principles. SEC Regulation S-X requires that publicly traded companies present their annual financial statements in accordance with GAAP. 17 C.F.R. §210.401(a)(1). In addition, Regulation S-X requires that interim financial statements also comply with GAAP, with the exception that interim financial statements also comply with GAAP, with the exception that interim financial may omit disclosures which would substantially duplicate those disclosures which accompany the annual financial statements. 17 C.F.R. §210.10.01(a). Financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

127. As set forth in Financial Accounting Standard Board ("FASB") Statement of Financial Accounting Concepts ("SFAC") No. 1, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented. SFAC No. 1 states:

42. Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investments and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of enterprise performance.

128. Additionally, §13 of the 1934 Act requires, in part, that companies:

(B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that –

\*        \*        \*

     (ii)    transactions are recorded as necessary (I) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets.

129.    SFAC No. 1 states that financial reporting, *i.e.*, financial statements and the related footnote disclosures, is intended to provide information that is useful to the users of the statements in making business and economic decisions. By presenting investors with financial information that did not reflect the true nature of fraudulent and inappropriate business practices, ITT did not provide useful information in the Company's financial statements.

130.    Similarly, SFAC No. 1 states that "[f]inancial reporting is expected to provide information about an enterprise's financial performance during a period and about how management of an enterprise has discharged its stewardship responsibility to owners." By presenting revenues and expenses that were grossed up by fraudulent business practices, defendants did not present the Company's actual financial performance. Results obtained through such business practices do not accurately reflect the Company's operations, are highly deceptive to investors, and are inherently unsustainable.

131.    SFAC No. 2 describes the characteristics required to make accounting information useful to the people that use it. One of these characteristics is representational faithfulness, which is defined as "[c]orrespondence or agreement between a measure or description and the phenomenon that it purports to represent (sometimes called validity)."

132.    Another characteristic defined in SFAC No. 2 is verifiability. Verifiability is "[t]he ability through consensus among measurers to ensure that information represents what it purports to represent or that the chosen method of measurement has been used without error or bias."

133.    ITT's materially false and misleading financial statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding ITT's actual operating results.  The Individual Defendants caused the Company to violate GAAP because defendants knew or recklessly disregarded that ITT's revenues were grossly inflated during the Relevant Period, as a result of the employment of certain business practices that were used to obtain improper federal financial aid and grants for its students.

134.    Revenue derived from such practices were not legitimate and ITT should not have recognized such revenue pursuant to GAAP.  GAAP requires that revenues not be recognized until earned.  An entity's revenue-earning activities involve delivering goods, rendering services or other activities that constitute its ongoing major or central operation.  Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash.  Readily convertible assets have (i) interchangeable (fungible) units and (ii) quoted prices available in an active market that can rapidly absorb the quantity held by the entity without significantly affecting the price.  SFAC No. 5, 83-84.  However, by, among other things, falsifying student records, ITT improperly recognized revenue because financial aid payments made by the federal government in reliance on inaccurate records created by ITT is not convertible to known amounts of cash or claims to cash due to their illegitimate nature and risk of disgorgement.  Thus, a material portion of the tuition payments made to ITT were not legitimate and did not generate revenue that ITT could recognize pursuant to GAAP.  As a result, ITT knowingly overstated the Company's revenue and earnings based on these transactions.

### ALLEGATIONS AGAINST PWC FOR PROFESSIONAL MALPRACTICE AND NEGLIGENCE AND FOR AIDING AND ABETTING THE INDIVIDUAL DEFENDANTS' VIOLATIONS OF LAW

135.    Throughout the Relevant Period PWC provided accounting and auditing services to ITT in addition to giving them accounting advice and consultation regarding ITT's annual and

quarterly reports filed with the SEC during 2002-2003, which concealed the Company's violations of state and federal educational finance law and falsely overstated ITT's revenues and earnings. To ensure PWC's loyalty, ITT also engaged PWC to provide lucrative tax, auditing and consulting services. PWC examined and opined on the financial statements of ITT, which PWC helped prepare and which PWC knew would be used, in whole or in part, to prepare the reported 2002-2003 annual and quarterly financial results and financial statements of ITT, and SEC filings and presentations to ITT shareholders. PWC also provided personal tax and consulting services to several of the Individual Defendants.

136. PWC enjoyed a lucrative, long-standing business relationship with ITT's senior management for which it has received tens of millions of dollars. For 2003, PWC received $397,400 in audit fees, $60,000 in audit-related fees and $137,286 in fees for tax and other non-audit services. PWC partners responsible for ITT engagement were particularly motivated to appease Champagne, Waddles and the other Individual Defendants because their remuneration was closely tied to the fees generated from ITT. Maintaining the client relationship was highly dependent on the Individual Defendants, particularly ITT's top executives, Champagne and Waddles, and PWC compromised themselves to maintain this relationship.

137. In connection with their audit and review of ITT's finances and operations, PWC had virtually limitless access to information in the companies' books and records:

- PWC was present at ITT's headquarters and key operating divisions frequently between 2002 and 2004.

- PWC regularly communicated with the Individual Defendants, including Champagne and Waddles, via face-to-face meetings and telephone calls.

- PWC had frequent conversations with ITT management and employees about the Company's operations and financial statements.

- PWC audited and reviewed ITT's 2002-2003 reports on Form 10-K and their financial statements and knew or should have known that those reports and the

financial statements contained therein were not accurate or prepared in compliance with GAAP or Generally Accepted Auditing Standards ("GAAS").

138.    PWC breached its duty to exercise reasonable care and competence in the course of providing professional accounting and auditing services for ITT. PWC reviewed the quarterly and year-end results of ITT, advised and/or opined upon the accuracy and bona fides of ITT's financial filings and had intimate knowledge of the nature of ITT's business, including compliance with state and federal educational finance laws and associated cash flows.

139.    PWC also attended the meetings of – and advised the members of – the Audit Committee of ITT in connection with the existing internal financial and accounting controls. As a result of their intimate knowledge of ITT's business, PWC knew or should have known about the educational law violations and improprieties at ITT.

140.    Besides learning at ITT's Board meetings and through contacts with executives that ITT was under investigation, PWC itself was named in the 1999 *Qui Tam* Action and thus received direct notice that former recruiting employees had alleged. Individual Defendants violated certain educational finance laws and regulations.

141.    PWC consented to the inclusion of their unqualified opinions on ITT's FY 2002-2003 financial statements, including its SEC reports on Form 10-K, which reports PWC knew, or should have known, was materially false. Despite PWC's breach of its duty to exercise reasonable care and competence in performing their services for ITT by allowing insiders to overstate revenues and earnings by including illicitly obtained government education finance funding, the Board of Directors, including the members of the Audit Committee, refused to terminate PWC as the "independent" auditor.

142.    PWC knew, or should have known, that ITT's financial statements and associated information was materially false and misleading because, among other things, they were not

prepared in accordance with GAAP and included false reports of ITT's revenues and earnings for 2002-2003. PWC also knew, or should have known based on their long-standing relationship with ITT and its senior management, that the false and misleading financial information would be used, in whole or in part, to prepare ITT's publicly reported annual and quarterly financial results and financial statements. Nevertheless, PWC provided unqualified opinions that ITT's 2002-2003 financial statements were valid and accurate and thereby aided and abetted the Individual Defendants in breaching their fiduciary duties to ITT.

143.     Defendant PWC owed a duty to ITT to perform its accounting and auditing services with reasonable care and competence. To discharge its duties, PWC was required to adhere to GAAS, which require that:

(a)     The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor;

(b)     In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors;

(c)     Due professional care is to be exercised in the performance of the audit and the preparation of the report;

(d)     The work is to be adequately planned and assistants, if any, are to be properly supervised;

(e)     A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of the tests to be performed;

(f)     Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit;

(g)    Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report; and

(h)    The report shall either contain an expression of an opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

144.    Thus, PWC owed ITT the obligation to act with reasonable care and competence in the performance of accounting and auditing services for ITT. PWC was required to exercise professional skepticism, an attitude that includes a questioning mind, including an increased recognition of the need to corroborate management representations and explanations concerning corporate matters where they had a direct financial interest in exaggeration or falsification.

145.    PWC represented they performed their audits in accordance with auditing standards in the United States. As a result, PWC was required to perform their audits in conformity with Statement of Accounting Standard ("SAS") No. 82, "Consideration of Fraud in a Financial Statement Audit," which includes auditing for misstatements arising from the misappropriation of assets. PWC failed to comply with SAS No. 82 in their audits of ITT's financial statements. During the course of their audits of ITT's financial statements for FY 2002-2003, PWC knew of or should have discovered the irregularities which caused ITT's revenues and earnings to be misstated. The very risk of fraud was a potential reportable condition which should have been reported to the audit committee and possibly senior management.

146.    PWC's failures to adequately perform their audit procedures to identify the improprieties alleged herein and their failure to report the problems permitted the accounting irregularities and improprieties to continue, leading to false and misstated financial statements.

147.    PWC, as the Company's auditor, was obligated to assess ITT's internal disclosure, financial and accounting controls and whether such controls had been placed in operation, were effective and complied with the Sarbanes-Oxley Act, including controls to provide assurance about the safeguarding of assets, financial reporting, operations and compliance with regulations. PWC was required to evaluate whether poor controls might lead to or contribute to the risk that fraud might not be detected.

148.    Internal controls are essential to a company's financial reporting, as adequately designed internal controls provide a company with reasonable assurance on the reliability of financial reporting, the effectiveness and efficiency of operations, and compliance with applicable laws and regulations. Auditing Standard ("AU") §319.06. Under auditing standards, as set forth in §319.02:

> In all audits, the auditor should obtain an understanding of internal control sufficient to plan the audit by performing procedures to understand the design of controls relevant to an audit of financial statements, and whether they have been placed in operation.

149.    If an auditor identifies any material weaknesses in a company's internal controls during an audit, then the auditor must communicate these weaknesses to the company's audit committee. AU §325. Further, the auditor should identify any limitations related to the internal control weaknesses in his or her audit opinion in accordance with the procedures proscribed by the professional standards.

150.    If the auditor has unresolved substantial doubt about the required supplemental information and its adherence to the prescribed guidelines, the auditor should identify this limitation

in his or her audit opinion in accordance with the procedures prescribed by the professional standards. AU §9558.06. Here, PWC issued a false clean audit opinion indicating it had no unresolved doubt about the veracity of ITT's financial information and its compliance with GAAP.

## COUNT I

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Breach of Fiduciary Duty Against All Individual Defendants

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    Each of the Individual Defendants knowingly, willfully, intentionally or recklessly permitted the actions taken to violate federal educational finance and securities laws, including overstating ITT's student enrollment, revenues and income, thus falsifying ITT's SEC filings and communications to shareholders and investors, including ITT's financial statements and information, and PWC aided and abetted those breaches. These defendants knew that if they disclosed the true facts concerning ITT's violations of educational finance laws and financial condition, they would jeopardize their control over the Company, the remuneration they received and their positions of power, prestige and profit at ITT, while exposing themselves to suits and investigations and the risks of civil liability, criminal prosecution or regulatory action.

153.    As officers, directors and "independent auditors" of publicly held companies, the Individual Defendants and PWC had a duty to disseminate accurate and truthful information with respect to ITT's operations, financial condition, assets and earnings to their shareholders, as well as the financial markets. The Individual Defendants and PWC did not do this. Instead they concealed the wrongdoing and disseminated false and misleading statements and reports about ITT its shareholders.

- 69 -

154.    The Individual Defendants, as officers and directors of ITT, participated in the acts of fraud and mismanagement alleged herein – knowingly, willfully, intentionally or recklessly. They thereby breached their fiduciary duties of care, candor, loyalty and disclosure to the Company's shareholders. They, aided and abetted by PWC, have thus exposed ITT to liability from, *inter alia*, class action suits for violation of the U.S. federal securities laws brought by and on behalf of those persons who purchased ITT shares or between April 17, 2003-February 25, 2004, as well as exposing the Company to criminal and civil prosecution for violations of the state and federal educational finance laws and regulations.

155.    The Individual Defendants and PWC also each owed a duty to ITT to test, oversee and monitor their systems of internal disclosure, financial and accounting controls, governance procedures and disclosure procedures and to ensure that they were functioning in an effective manner and in compliance with, *inter alia*, the Sarbanes-Oxley Act.

156.    During the Relevant Period, certain individual defendants misappropriated ITT's proprietary information by selling over 300,000 shares of its common stock while in possession of material non-public information for proceeds of over $14.1 million. At the same time the price of the Company's common stock was artificially inflated by the Individual Defendants and PWC's misstatements and certain Individual Defendants were selling over $14.1 million worth of personally-held ITT stock into the market, the Individual Defendants were causing ITT repurchase over $28 million worth of its own stock on the open market at inflated prices in order to further support the Company's stock price:

|                                  | FY 2003        | FY 2002        |
|----------------------------------|----------------|----------------|
| **TOTAL SHARES REPURCHASED**     | 1,078,000      | 2,174,300      |
| **TOTAL COST OF SHARES REPURCHASED** | $28.7 million | $44.5 million  |

157.    The conduct outlined herein was not due to an honest error of judgment, but rather to the defendants' bad faith and was done knowingly, willfully, intentionally or recklessly.

158.    By reason of the foregoing, ITT has been damaged.

## COUNT II

### Abuse of Control Against All Individual Defendants

159.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.    For the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over ITT, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions, the Individual Defendants employed the alleged scheme. As a part of this scheme, these Individual Defendants actively permitted the Company to violate applicable educational finance laws and made and/or participated in the making of or aided and abetted the making or the concealment of, numerous omissions and misrepresentations of facts regarding ITT to shareholders. These representations and statements were untrue and the Individual Defendants did not believe them to be true when made, and knowingly, willfully and/or intentionally made them without regard to their truthfulness or aided and abetted the making of said representations.

161.    The Individual Defendants' conduct constituted an abuse of their ability to control and influence ITT. By reason of the foregoing, ITT has been damaged.

## COUNT III

### Gross Mismanagement Against All Individual Defendants

162.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

- 71 -

163.    The Individual Defendants had a duty to ITT and their shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of ITT.

164.    These Individual Defendants by their actions and by engaging in the fraud described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of ITT in a manner consistent with the duties imposed upon them by law, including the Sarbanes-Oxley Act.  Knowing ITT's business model was highly dependent upon maintaining a stellar reputation as a reputable provider of for-profit higher education, both to facilitate student enrollment and to ensure adequate financing for those students through state and federal agencies, the ITT Board had a duty to make sure the Company operations complied with the letter and the spirit of the law.  Instead of complying with their fiduciary duties to oversee the Company's operations and to implement systems to prevent the violation of law, the ITT Board members and executives abrogated their duties and failed to oversee the Company's operations and to require full and prompt disclosure of material business problems.  By committing and concealing this fraud, the Individual Defendants breached their duties of due care, diligence and candor in the management and administration of ITT's affairs and in the use and preservation of ITT's assets.

165.    The Individual Defendants also caused ITT to engage in a fraud upon purchasers of the Company's stock in violation of the federal securities laws.  During the course of the discharge of their duties, these defendants knew or recklessly disregarded the unreasonable risks and losses associated with their fraud and misconduct, yet these defendants caused ITT to engage in this scheme which they knew had an unreasonable risk of damage to ITT, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged ITT.

166.    By reason of the foregoing, ITT has been damaged.

## COUNT IV

### Constructive Fraud Against All Individual Defendants

167.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.    As corporate fiduciaries, the Individual Defendants owed to ITT and their shareholders a duty of candor and full accurate disclosure regarding the true state of ITT's business and assets and their conduct with regard thereto.

169.    As a result of the conduct complained of, the Individual Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from ITT shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of ITT. Thus they have committed constructive fraud and violated their duty of candor.

170.    By reason of the foregoing, ITT has been damaged.

## COUNT V

### Unjust Enrichment Against All Individual Defendants

171.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

172.    As a result of the conduct described above, all the Individual Defendants will be and have been unjustly enriched at the expense of ITT, in the form of unjustified salaries, benefits, bonuses, stock options and grants and other emoluments of office, and through the misappropriation of ITT's proprietary information to engage in insider stock sales.

173.    Certain of the Individual Defendants sold ITT stock for a profit during the period of deception, misusing confidential non-public corporate information. These defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of ITT. A constructive trust for the benefit of ITT should be imposed thereon.

## COUNT VI

### Derivatively Against the Individual Defendants and PWC for Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder

174.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175.    During the Relevant Period, the Individual Defendants and PWC disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

176.    Certain Individual Defendants (as detailed in ¶¶25-26, 29, 35-37 ) also sold over 300,000 shares of ITT's common stock at inflated prices during the Relevant Period, receiving over $14.1 million in proceeds, while in possession of material non-public information. These defendants misappropriated ITT's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold ITT stock without disclosing the information alleged to have been concealed herein.

177.    At the same time the price of the Company's common stock was inflated by the Individual Defendants' and PWC's misstatements and certain Individual Defendants were selling stock into the market, the Individual Defendants were causing ITT repurchase its own stock on the open market at inflated prices:

|                                         | FY 2003        | FY 2002        |
|-----------------------------------------|----------------|----------------|
| **TOTAL SHARES REPURCHASED**            | 1,078,000      | 2,174,300      |
| **TOTAL COST OF SHARES REPURCHASED**    | $28.7 million  | $44.5 million  |

178.    As such, the Individual Defendants and PWC violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon ITT and others in connection with their purchases of ITT common stock during the Relevant Period.

179.    As a result of the Individual Defendants' and PWC's misconduct, ITT has and will suffer damages in that it paid artificially inflated prices for ITT common stock purchased on the openmarket. ITT would not have purchased ITT common stock at the prices it paid, had the market been aware that the market price of ITT's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, ITT suffered damages in connection with its purchases of ITT common stock during the Relevant Period. By reason of such conduct, the Individual Defendants and PWC are liable pursuant to §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT VII

### Professional Negligence and Accounting Malpractice
### Against PWC

180.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

181.    PWC issued unqualified opinions on the 2002-2003 financial statements of ITT, stating that those financial statements were presented in accordance with GAAP based on PWC's audits which were performed in accordance with GAAS. GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), govern the conduct of audit

engagements. In fact, the audit reports were false and misleading due to, among other things, PWC's failure to conduct the audits in accordance with GAAS and the fact that ITT's 2002-2003 financial statements were not prepared in conformity with GAAP. PWC's reports were in violation of GAAS, GAAP and SEC rules.

182. The objective of audits of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations and cash flows in conformity with GAAP. The auditor's report is the medium through which he expresses his opinion or, if circumstances require, disclaims an opinion. In either case, he states his audit has been in accordance with GAAS. These standards require him to state whether, in his opinion, the financial statements are presented in accordance with GAAP and to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period. AU §110.01.

183. GAAS as approved and adopted by the membership of the AICPA, are comprised of 10 general standards. These standards to a great extent are interrelated and interdependent. The independent auditor is responsible for compliance with GAAS in an audit engagement. The 10 general standards are as follows:

General Standards

1. The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

2. In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

3. Due professional care is to be exercised in the performance of the audit and the preparation of the report.

Standards of Fieldwork

1. The work is to be adequately planned and assistants, if any, are to be properly supervised.

2. A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed.

3. Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

Standards of Reporting

1. The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

2. The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3. Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

4. The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefore should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

184. PWC's audits of ITT's 2002-2003 financial statements violated each of the general standards.

185. PWC is one of the largest international firms of certified public accountants and is a member of the AICPA. PWC was the auditor of ITT's financial statements for 2002-2003. In addition, they were paid to review the quarterly financial statements of ITT throughout this period. PWC audited ITT's 2002-2003 financial statements and issued their audit opinions stating that those financial statements were fairly presented in accordance with GAAP and that they had audited those financial statements in accordance with GAAS. Both of those statements were false. PWC was aware of facts that undeniably precluded them from making of those statements at the time they were

made.  ITT's financial statements and PWC's opinions on them were then used by ITT with its consent to publicly disseminate ITT's 2002-2003 financial results in the filing of their annual Forms 10-K with the SEC.

186.    PWC was negligent in failing to comply with GAAS as ITT's independent accountant.  ITT issued unqualified opinions stating that the financial statements of ITT were fairly presented in accordance with GAAP, when they were aware of or should have been aware of facts and circumstances that undermined such unqualified opinions and rendered them false and misleading.

187.    In the course of performing their audit services, the accountants obtained evidential matter revealing the adverse facts detailed above about ITT's non-compliance with applicable educational finance laws and ITT's own finances, but improperly failed to require them to adjust their financial statements or make disclosure of such facts.  As a result of their investigations and audit work, the accountants knew that the reports and financial statements described herein were materially misleading or negligently disregarded facts that showed that all such statements were materially misleading.

188.    Because: (a) PWC was itself named in the 1999 *Qui Tam* Action; (b) PWC spoke regularly with ITT Board and Audit Committee members who were knowledgeable about the violations of law and the undisclosed CAG and DOJ investigations; and (c) PWC attended certain of Board and Audit Committee meetings where legal compliance was discussed, PWC knew or negligently disregarded facts that indicated that they should have: (i) qualified their opinions on ITT's financial statements for the years ended December 31, 2002 and 2003; or (ii) required the Company to adjust its financial statements; or (iii) refused to give opinions in light of the materially adverse effects of the undisclosed facts about ITT's financial condition, including the material

- 78 -

overstatement of revenues and earnings based on the fact that some of these revenues and earnings were potentially derived from improperly obtained state and federal educational finance funds. The failure to make such qualification, correction, modification or withdrawal was a violation of GAAS, including the Fourth Standard of Reporting.

189.     The accountants failed to require ITT to disclose material adverse facts and allowed the companies to make material misrepresentations to their shareholders and to the investing public.

190.     The accountants violated GAAS General Standard No. 3 that requires that due professional care must be exercised by the auditor in performance of the examination and the preparation of the audit report.

191.     The accountants violated GAAS Standard of Field Work No. 2 that requires the auditor to make a proper study of existing internal controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. The accountants, knowing that ITT's internal controls were insufficient, failed to expand their auditing procedures.

192.     The accountants violated GAAS Standard of Field Work No. 3 that requires sufficient competent evidential matter be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion to be issued on the subject financial statements. As described above, the accountants failed to obtain sufficient competent evidential matter as to the amounts of ITT's compliance with applicable educational finance laws that governed the receipt of a large portion of the Company's revenues.

193.     The accountants violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP. The accountants' opinions falsely represented that ITT's financial statements complied with GAAP,

when the accountants knew or negligently disregarded that they did not for the reasons herein alleged.

194.    The accountants violated GAAS Standard of Reporting No. 4 that requires, when an opinion on the financial statements as a whole cannot be expressed, that the reasons be stated. The accountants should have either stated that no opinion could be issued by them on ITT's financial statements or issued an adverse opinion stating that the financial statements were not fairly presented.

195.    The accountants violated Standard of Field Work No. 1 and the standards set forth in AU §§310, 320 and 327 by, among other things, failing to adequately plan their audit and properly supervise the work of their assistants so as to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

196.    The accountants violated SAS No. 16 in that they failed to perform their examination with an attitude of professional skepticism and, in connection with the year-end 2003 audits, ignored numerous "red flags" that would reasonably have led to the discovery of the fraudulent overstatement of ITT's student enrollment numbers, government sponsored loan proceeds and associated cash flows – including having themselves been named in a lawsuit.

197.    The accountants violated AU §316.20, which requires that additional procedures should be performed when evaluation at the financial-statement level indicates significant risk.

198.    As a result of the foregoing, the accountants' certification of the 2002-2003 financial statements falsely represented that the statements were audited pursuant to GAAS and that ITT's financial statements were presented in conformity with GAAP. The accountants knew that such certification was false and misleading because, as detailed herein: (a) the accountants knew or were

negligent in not knowing that the Company's financial statements violated GAAP; and (b) the accountants knew they had not complied with GAAS.

199.    As a result of the services rendered to ITT, PWC's personnel were present at their corporate headquarters and major operating offices and examined or participated in reviews, investigations and audit procedures regarding the financial condition, business operations and financial, accounting and management-control systems of ITT.  In the course of performing such services, the accountants had virtually unlimited access to substantial evidential matter revealing the adverse facts about the Company's compliance with educational finance reporting requirements and laws and the finances of ITT, but improperly failed to require adjustment for or disclosure of such facts.

200.    The accountants: (a) knew or were negligent in not knowing of the material, adverse, non-public information about the financial statements of ITT, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about ITT pleaded herein, involving the SEC reports on Form 10-K.

201.    In performing auditing and accounting services on behalf of ITT and engaging in the wrongful acts alleged herein, the accountants knew or should have known that their clients would, and did, transmit false and misleading financial information to the investing public.  However, the accountants failed to discharge their duties in adherence to GAAP and GAAS to detect errors and irregularities.

202.    In performing the auditing and accounting services to ITT in the manner alleged herein, the accounting firms owed a duty to ITT and their shareholders to use such skill, care and

diligence as other members of its profession commonly exercised.  The accountants, however, breached such duty by committing the wrongful acts and conduct alleged herein.

203.    ITT relied to their detriment on the accountants and were damaged thereby.

204.    As a direct, foreseeable and proximate result of the accountants' breach of duties owed to ITT, it was damaged.

### COUNT VIII

### Aiding and Abetting Breaches of Fiduciary Duty,
### Abuse of Control, Unjust Enrichment and Gross Mismanagement
### Against PWC

205.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

206.    Defendant PWC abetted the Individual Defendants in breaching their fiduciary obligations owed to ITT resulting in the wrongdoing and damages to those entities complained of herein.  The accountants knew or should have known that the 2002-2003 SEC reports and financial statements contained therein were materially false and misleading.  The accountants also knew, or should have known, that the false and misleading information would be used, in whole or in part, by ITT to prepare their publicly reported financial results and financial statements.  Nevertheless, the accountants actively prepared the false and misleading information and thereby aided and abetted defendants' breaches of fiduciary duty and their abuse of control, gross mismanagement and violation of their duty of candor to ITT shareholders, complained of herein.

207.    As a direct, foreseeable and proximate result of the accountants' aiding and abetting of defendants' breaches of fiduciary duty, ITT has been damaged.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure defendants do not participate therein or benefit thereby;

B.      Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and statutory provisions sued hereunder, including disgorging, attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of ITT has an effective remedy;

D.      Directing ITT to take all necessary actions to reform and improve their corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the companies' by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)      a proposal to strengthen the Boards' supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii)      a provision to permit the shareholders of ITT to nominate at least three candidates for election to the board of directors;

(iii)      appropriately test and then strengthen the internal audit and control functions;

        (iv)     control and limit insider stock selling; and

        (v)     reform executive compensation.

    E.     Awarding punitive damages;

    F.     Awarding costs and disbursements of this action, including reasonable attorneys',

accountants' and experts' fees; and

    G.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: September __, 2004

PARR RICHEY OBREMSKEY & MORTON
JAMES A.L. BUDDENBAUM (14511-49)
ANTHONY W. PATTERSON (17497-53)


                JAMES A.L. BUDDENBAUM

Ten West Market Street
1600 Market Tower
Indianapolis, IN  46204
Telephone:  317/269-2500
317/269-2514 (fax)
jbuddenbaum@parrlaw.com
tpatterson@parrlaw.com

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
MARY K. BLASY


                WILLIAM S. LERACH

401 B Street, Suite 1700
Telephone:  619/231-1058
619/231-7423 (fax)

BRANSTETTER, KILGORE, STRANCH
  & JENNINGS
JAMES G. STRANCH, III
C. DEWEY BRANSTETTER
227 Second Avenue, North, 4th Floor
Nashville, TN 37201-1631
Telephone: 615/254-8801
615/255-5419 (fax)

BARRETT, JOHNSTON & PARSLEY
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)

Attorneys for Plaintiffs

S:\CptDraft\Derivative\Cpt ITT-two.doc

## VERIFICATION

I, William S. Lerach, hereby declare as follows:

I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiffs in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated herein are true.

I make this Verification because plaintiffs are absent from the County of San Diego where I maintain my office.

Executed this 3rd day of September, 2004, at San Diego, California.

_____
WILLIAM S. LERACH

S:\CptDraft\Derivative\Cpt ITT-two.doc